[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 10-12665

_____

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
JULY 6, 2012
JOHN LEY
CLERK

D. C. Docket No. 2:97-cv-11441-RDP

ZUZANNA JURIS,

Plaintiff-Appellant,

versus

INAMED CORPORATION,
MCGHAN MEDICAL CORP.,
et al.,

Defendants-Appellees.

_____

Appeal from the United States District Court
for the Northern District of Alabama

_____

(July 6, 2012)

Before TJOFLAT, CARNES and ANDERSON, Circuit Judges.

ANDERSON, Circuit Judge:

In 1999, the United States District Court for the Northern District of

Alabama approved a mandatory, limited fund class settlement, which resolved tens

of thousands of claims arising out of injuries allegedly caused by defective silicone breast implants manufactured by Inamed Corporation ("Inamed"). Several years later, in 2006, Zuzanna Juris filed an individual action in California state court against Inamed and Allergan, Inc. ("Allergan"), Inamed's successor, alleging injuries caused by her Inamed implants. The defendants contended that Juris's lawsuit was barred because the 1999 class settlement resolved her claims; Juris posited that she could avoid the settlement's res judicata effect on due process grounds. The district court held that the class settlement precluded Juris from prosecuting the California case. This is Juris's appeal.

For the reasons explained below, we affirm.

## I. BACKGROUND [1]

Well after the creation of silicone breast implants, women implanted with them began claiming that leaking gel was causing them various diseases. In 1992, the Food and Drug Administration ("FDA") first banned the use of silicone gel implants, and a flood of litigation followed. The FDA relaxed the ban later that year to permit the use of such implants for specified medical procedures. The

---

[1] The district court should be commended for the comprehensive narrative in which it set forth this case's complex procedural and factual history. Throughout Part I.A through E, we borrow in large part from the findings of fact in the district court's memorandum opinion.

number of lawsuits only increased further.  As a result, the Judicial Panel on Multidistrict Litigation consolidated more than 21,000 cases against various breast implant manufacturers for pretrial proceedings and transferred them to District Judge Sam Pointer in the Northern District of Alabama.[2]  See In re Silicone Gel Breast Implants Prods. Liab. Litig., 793 F. Supp. 1098 (J.P.M.L. 1992); In re Silicone Breast Implants Prods. Liab. Litig., MDL 926, 2:92-cv-10000 (N.D. Ala.).  The transfer included all pending federal lawsuits against Inamed regarding allegedly defective implants.

A. Inamed's Pre-Settlement Financial Condition

In 1991, women with Inamed breast implants began filing individual suits against Inamed and its subsidiaries.  The litigation ballooned.  At one point, more than 15,000 lawsuits were pending against Inamed across the country.  Breast implant litigation forced the company to divert substantial capital to funding defense efforts.  In 1994, in an attempt to stem the tide, Inamed and the plaintiffs' settlement committee negotiated a global settlement agreement, which would have required Inamed to pay $1 million per year for twenty-five years.  Anticipating

---

[2]      Troubled by allegations of forum shopping, litigation strategies, and underlying motives, the multidistrict panel rejected the forum preferences of both sides and independently assigned the case to Judge Pointer in light of his experience and reputation.

approval of that proposal, Inamed booked the $25 million annuity as a contingent liability in the amount of $9.2 million (the present value of twenty-five annual payments of $1 million).  Inamed sought to certify a limited fund settlement class pursuant to Federal Rule of Civil Procedure 23(b)(1)(B) in an effort to secure a mandatory, global resolution of all present and future claims.  The plaintiffs' settlement committee retained Ernst & Young to review Inamed's finances and determine whether limited fund treatment was appropriate.  Ernst & Young issued a report confirming Inamed's claims that its liabilities, both operational and litigation-related, dwarfed its assets.  Counsel for the plaintiffs did not dispute this.  However, they questioned whether the $9.2 million present value contribution was prudent considering Inamed's potential future earnings.  Disagreement yielded further negotiations, and the possibility of a global settlement languished.

Responding to its growing financial troubles, in 1996, Inamed approached a high risk investment group and raised $35 million through the private placement of senior secured convertible notes.  The notes were senior to all claims, including operational liabilities and tort claims, and were secured by interests in substantially all of Inamed's assets.  Pursuant to the terms of the offering, Inamed deposited $15 million in escrow for the sole purpose of financing a non-opt-out class settlement if approved before January 23, 1997.  That temporal condition

4

was not met.  Inamed returned the $15 million to the noteholders in exchange for warrants to purchase Inamed common stock in the event a mandatory class settlement was later approved.  Inamed quickly exhausted the balance, $20 million, which provided necessary cash to stay in business and cover expenditures related to inventory, payments to vendors, and other operational items.

In January of 1997, Inamed secured an additional $6.2 million through another private debt placement.  All proceeds were immediately applied towards day-to-day operational expenses and payments against past-due income tax liabilities.  Around this time, Inamed defaulted on its repayment obligations under the senior secured notes and its stock price dropped.  The company continued to explore options for raising working capital.  However, between the senior secured noteholders exercising their veto authority over Inamed's ability to raise capital through equity offerings and, more generally, the unavailability of commercially reasonable lending opportunities given the company's dire financial predicament, Inamed's only option was to borrow approximately $10 million from an entity associated with its former chairman.

Throughout the 1990s, each audit letter prepared by Inamed's independent auditing firm, Coopers & Lybrand, included a qualified opinion expressing "substantial doubt about the Company's ability to continue as a going concern."

5

For fiscal years 1995, 1996, and 1997, Inamed reported pre-tax operating losses of $8.6 million, $6.0 million, and $6.6 million, respectively. By the end of 1997, the company's consolidated book value—subtracting liabilities from assets—was negative $10.9 million. Setting aside the $9.2 million contingent liability booked in 1994 in anticipation of the proposed global settlement, Inamed's book value was still negative $1.7 million. And, significantly, other than the $9.2 million contingent liability, Inamed's balance sheet did not account for any other litigation expenses, including possible settlements, attorneys' fees, and potential judgments. Those litigation expenses, however, were staggering. For example, it cost Inamed's attorneys approximately $150,000 to take a single case to the brink of trial, and an additional $150,000 to defend through trial. In 1997 alone, Inamed settled sixteen breast implant cases. The settlement values ranged from $2,500 to $50,000, averaging out to $18,500 per case.[3] During this time, neither Inamed nor its subsidiaries had products liability insurance coverage.

In light of Inamed's rapidly deteriorating financial condition, in the latter part of 1997, the company and plaintiffs' counsel revisited settlement negotiations. By this time, investors were unwilling to finance any settlement that would not

---

[3]    In addition, an individual case that went to trial against Inamed could produce—and in the past had produced—a multimillion dollar jury verdict.

extinguish substantially all of the breast implant litigation. They considered elimination of the enormous costs and risks associated with the implant litigation an essential precondition to the economic turnaround that would be necessary to repay any investment. Coupling this pressure with the senior secured noteholders' authority over Inamed's financial decisions, Inamed's ability to afford any settlement was dependent on the senior creditors' willingness to finance it.

The parties considered the possibility of Inamed pursuing bankruptcy. Chapter 7 liquidation, as opposed to Chapter 11 reorganization, was the only viable solution to Inamed's financial stresses. If Inamed had elected to pursue Chapter 7 bankruptcy at the end of 1997, the company's saleable assets, discounted by the impairment likely to result from a forced liquidation, would have totaled between $11.4 million and $20.4 million. From this sum, the senior secured noteholders would have been entitled to $19 million, leaving unsecured creditors—trade creditors, subordinated noteholders and tort claimants—with somewhere between $0 and $1.4 million. At best, the tort claimants would have been left to compete for $1.4 million against trade creditors, with rights to payment valued at $12.5 million, and subordinated noteholders, with rights to payment valued at $10 million.

Plaintiffs' counsel, including Ernest Hornsby, an attorney designated to

represent the interests of Inamed breast implant recipients with potential, future injury claims, negotiated with Inamed and its senior secured noteholders.[4]  The senior secured noteholders—the only lenders open to advancing Inamed funds for settlement—conditioned financing on the settlement being mandatory and not exceeding $31.5 million.  These senior creditors had no obligation to contribute funds.  If plaintiffs' counsel demanded either opt-out rights or settlement funds beyond $31.5 million, Inamed, steered by its senior creditors, was prepared to pursue liquidation.  Thus, the proposed class settlement created a substantial recovery fund that otherwise would not exist.  Plaintiffs' counsel ultimately accepted the comparative benefit of the $31.5 million limited fund, obtained by Inamed from the senior secured noteholders, as the only available resolution.  They concluded that all Inamed implant claimants, whether their injuries had manifested or not, had a common interest in securing a certain source of recovery for their claims; none would be well served by the alternatives of default, insolvency, or bankruptcy.

---

[4]     Hornsby was brought in to address the possibility that implant recipients with manifested injuries and those without manifested injuries had divergent or conflicting interests. In order to ensure that all viewpoints were represented, Hornsby directly participated in negotiations on behalf of the implant recipients with only potential, future claims.

B. Notice of the Proposed Settlement Class

The parties presented Judge Pointer with the proposed settlement, which called for class certification of a $31.5 million mandatory, limited fund class and imposed on Inamed certain disclosure obligations with respect to ongoing breast implant studies.  On June 2, 1998, Judge Pointer provisionally certified and approved the mandatory, limited fund class under Rule 23(b)(1)(B).  He expressly conditioned permanent certification and final approval "upon an evidentiary showing, to this Court's satisfaction, that a 'limited fund' or other circumstances exist satisfying the criteria for mandatory class certification under Rule 23, and that the proposed settlement is in the best interests of the class and should be approved under Rule 23(e)."  District Court order, Docket No. 10 at 3.  Subsequently, on October 7, 1998, Judge Pointer entered Order 47.  Among other things, that order directed that notice be given to all individuals potentially affected by the class settlement.  In furnishing the notice plan, Judge Pointer attempted to approximate the level and quality of notice required by Rule 23(b)(3), even though the class was provisionally certified under Rule 23(b)(1)(B).[5]

Judge Pointer first directed notice to be sent to approximately 250,000

---

[5]    "For any class certified under Rule 23(b)(3), the court must direct to class members the best notice that is practicable under the circumstances, including individual notice to all members who can be identified through reasonable effort."  Fed. R. Civ. P. 23(c)(2)(B).

9

women registered with the MDL 926 claims office, estimating that 80,000 were potential class members.[6] He also directed notice to 28,000 attorneys known to represent plaintiffs with breast implant-related claims against Inamed. However, because not all Inamed breast implant recipients were registered with the claims office or represented by counsel, Judge Pointer ordered that notice of the proposed settlement be published in various periodicals. Judge Pointer approved the text of the proposed notice, and class counsel retained Hilsoft Notifications to design the layout and select the appropriate publications. Notices of the proposed settlement appeared in the October 28, 1998, edition of USA Today and the October 30, 1998, edition of People Magazine. Together, these publications reached an estimated 26,641,000 females. In addition, Judge Pointer approved another notice that was placed in the December 7, 1998, edition of Modern Healthcare Magazine, a publication with a total readership of 76,482. The magazine posted the same notice on its website from November 23, 1998, through December 7, 1998.

---

[6]    In 1994, in connection with the "Original Global Settlement," an extensive notice campaign invited all women with breast implants to register with the MDL 926 claims office. That particular settlement sought to resolve claims against Inamed and various other manufacturers; as such, the 1994 notice campaign resulted in several hundred thousand women registering with the claims office, only a fraction of whom had Inamed breast implants. Although the 1994 settlement ultimately fell apart, the pool of information collected remained on file with the claims office. In 1999, Judge Pointer directed that notice of the proposed Inamed class settlement be mailed to all individuals registered with the MDL 926 claims office, except for those who clearly would not qualify as class members or have any interest in participating.

Finally, Judge Pointer had notice of the proposed settlement placed on the court-supervised website from October of 1998 through January of 1999.

Each of the above-described notices contained the following details: The district court had preliminarily certified and approved a $31.5 million mandatory class settlement against Inamed; if approved, the class settlement would extinguish all claims, filed or otherwise, against Inamed in connection with implants received prior to June 1, 1993; certification and settlement objections had to be postmarked by December 11, 1998; a copy of the proposed settlement could be obtained for free; and a hearing on the propriety of final class certification and settlement approval would be held on January 11, 1999, at the federal courthouse in Birmingham, Alabama.

C. Certification of the Inamed Settlement Class

On January 11, 1999, Judge Pointer held a hearing for the purpose of considering class certification and approval of the settlement. The class's negotiation committee agreed with Judge Pointer that, to the extent there was a conflict between current injury and future injury claimants, it was relevant only to the distribution plan. There were no conflicts with respect to the initial decision as to whether to certify a limited fund class. More specifically, Judge Pointer

11

explained that it would be premature to consider potential conflicts or proper distribution methods before he could be certain that there was, in fact, a settlement fund with money to distribute. He believed it was in the best interest of all members of the proposed class to secure the largest fund possible, as soon as possible, and to bring that fund under the control of the court.

Various concerns were presented at the hearing through oral and written objections. Among the objections presented were the following: (1) the settlement fund was insufficient; (2) future claimants should be entitled to opt out and reserve their legal rights; (3) the settlement lacked a predetermined distribution plan; (4) mandatory class members should nevertheless be given a right to opt out under Phillips Petroleum Co. v. Shutts, 472 U.S. 797, 105 S. Ct. 2965 (1985); (5) notice was inadequate as to future injury claimants; (6) the settlement would violate the Rules Enabling Act; (7) the settlement would improperly side step bankruptcy; (8) Inamed was not a limited fund in light of the slight economic turnaround the company experienced after provisional approval of the mandatory class settlement; (9) the district court should delay consideration of the proposed class settlement in light of the Supreme Court's pending decision in Ortiz v. Fibreboard Corp., 527 U.S. 815, 119 S. Ct. 2295 (1999); and (10) the district court did not have jurisdiction to enjoin parallel state court proceedings.

12

After carefully considering these objections, on February 1, 1999, Judge Pointer entered Order 47A, certifying the non-opt-out settlement class. Judge Pointer concluded that the proposed class satisfied the threshold requirements for certification found in Rule 23(a).[7] In doing so, he found as follows: There were tens of thousands of individuals in the Inamed settlement class, making joinder impracticable; questions of fact and law common to the class existed, including whether Inamed's breast implant products were defective and unreasonably dangerous, and whether the company's conduct, level of knowledge, or duty would give rise to liability; the class members had a common interest in determining whether a limited fund existed, avoiding that fund's diminishment through bankruptcy, and establishing equitable procedures for its distribution; and the claims of the class representatives were typical of the class in that they asserted the same types of factual and legal liability theories generally asserted by the class members. With respect to Rule 23(a)(4), Judge Pointer noted that the "Representative Plaintiffs, who reflect the full spectrum of breast implant claimants ranging from claimants with no manifested injuries to claimants with

---

[7] Rule 23(a) provides that "[o]ne or more members of a class may sue or be sued as representative parties on behalf of all members only if: (1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a).

13

serious illnesses . . . will fairly and adequately protect the interests of the Inamed

Settlement Class."  District Court order, Docket No. 59 at 3.

The class was certified pursuant to Rule 23(b)(1)(B), which authorizes

certification when "prosecuting separate actions by or against individual class

members would create a risk of . . . adjudications with respect to individual class

members that, as a practical matter, would be dispositive of the interests of the

other members not parties to the individual adjudications or would substantially

impair or impede their ability to protect their interests."[8]  Based on evidentiary

submissions,[9] Judge Pointer found that Inamed's probable liability to the class

members from the implant litigation greatly exceeded Inamed's limited financial

resources; that the settlement fund made available by certification was

substantially greater than the amount, if any, that would be available in the

---

[8]    "In contrast to class actions brought under subdivision (b)(3), in cases brought under subdivision (b)(1), Rule 23 does not provide for absent class members to receive notice and to exclude themselves from class membership as a matter of right.  It is for this reason that such cases are often referred to as 'mandatory' class actions."  Ortiz v. Fibreboard Corp., 527 U.S. 815, 834 n.13, 119 S. Ct. 2295, 2309 (1999) (citation omitted).

[9]    The parties submitted evidence regarding Inamed's financial condition, inability to fully satisfy class members' claims, and imminent Chapter 7 liquidation.  This evidence included a declaration from Alan Jacobs, a partner at Ernst & Young who served as a financial advisor to the settlement class counsel since 1994; a declaration from Richard Babbit, Inamed's President and CEO, which attached recent SEC filings and explained their significance; and a declaration from L. Richard Rawls, Inamed's national coordinating trial counsel.  In addition, at the January 11, 1999, hearing, Judge Pointer heard testimony from Jacobs, who was examined by counsel representing future injury claimants as well as counsel representing objecting class members.

14

absence of certification; and that Inamed constituted a "limited fund" against which claims are properly subject to certification under Rule 23(b)(1)(B). Thus, Judge Pointer found that mandatory certification was warranted because "continued prosecution of separate actions by individual members of the Inamed Settlement Class would create a risk of adjudications with respect to individual Inamed Settlement Class members that would as a practical matter be dispositive of the interests of the other Inamed Class Settlement members not parties to the adjudications or substantially impair or impede their ability to protect their interest." District Court order, Docket No. 59 at 3.

Judge Pointer certified the class even though Inamed had experienced a slight financial rebound following announcement of the proposed settlement. Inamed's stock price had risen, suggesting an increased aggregate market value, and class objectors argued that Inamed was therefore not a limited fund. Inamed responded that market capitalization was not an appropriate valuation method. First, it was circular to say that Inamed was not a limited fund because the announcement of a mandatory class settlement caused its stock to rise. The stock value reflected a market expectation that the settlement would be completed and the company would achieve total relief from the expense and uncertainty surrounding the breast implant litigation. Second, the increase in Inamed's stock

price in no way measured the company's ability to pay, especially if the flood of pending breast implant cases was not resolved with the proposed settlement. Inamed reiterated that it was the settlement's preliminary approval that had, in large part, made possible the restructuring efforts that further contributed to the company's improved financial condition. After careful consideration of the arguments of the parties and the underlying evidence, Judge Pointer overruled the objection grounded in the recent improvements in Inamed's operation performance and stock price. He later found that the $31.5 million settlement fund was substantially greater than the amount that would be available in the absence of certification, that the settlement fund was the maximum fund that feasibly could be expected, and that Inamed's probable liability to the class members greatly exceed the $31.5 million fund (which in turn greatly exceeded the value of the entirety of all other resources available to pay claims to the class members).

Judge Pointer additionally evaluated the settlement for fairness pursuant to Rule 23(e)[10] and determined it was non-collusive, negotiated in good faith, fair,

---

[10]    At the time Judge Pointer considered the propriety of the settlement proposal, Rule 23(e) provided that "[a] class action shall not be dismissed or compromised without the approval of the court, and notice of the proposed dismissal or compromise shall be given to all members of the class in such manner as the court directs." Fed. R. Civ. P. 23(e) (1998). In 2003, however, Rule 23(e) was expanded. The rule now requires that, before the claims of a "certified class may be settled, voluntarily dismissed, or compromised," the court must approve the proposed settlement, subject to the following procedures and considerations: "(1) The Court must direct notice in a reasonable manner to all class members who would be bound by the proposal.

16

adequate, and reasonable.  Importantly, he found:

> The evidence shows, inter alia, that—absent the new capital contributed to the company conditioned upon approval of this settlement—Inamed has negative net worth, net liquidation value of essentially zero, and no resources to pay claims.  The company has had to borrow heavily in order to stay afloat.  The settlement is to be funded by additional borrowing available only in the context of this settlement, and the amount Inamed was able to raise for that purpose was constrained both by restrictions associated with its existing debt and the willingness of its lenders to assume the risk that the company's post-settlement operations would repay their investment.  The record establishes that Inamed would be unable to raise such additional funds in the absence of this settlement, that the alternative of continued litigation of individual claims would drive Inamed to bankruptcy, and that the funds available to class members from this settlement are substantially greater than the funds, if any, that would remain for class members after an Inamed bankruptcy.  Considering the record evidence of Inamed's financial condition, the court finds a substantial risk that an Inamed bankruptcy would leave all class members with nothing.

District Court order, Docket No. 59 at 4.

The class included "all persons and entities, wherever located, who have or may in the future have any unsatisfied claim (whether filed or unfiled, pending or reduced to judgment, existing or contingent, and specifically including claims for

---

(2) If the proposal would bind class members, the court may approve it only after a hearing and on finding that it is fair, reasonable, and adequate. (3) The parties seeking approval must file a statement identifying any agreement made in connection with the proposal. (4) If the class action was previously certified under Rule 23(b)(3), the court may refuse to approve a settlement unless it affords a new opportunity to request exclusion to individual class members who had an earlier opportunity to request exclusion but did not do so. (5) Any class member may object to the proposal if it requires court approval under this subdivision (e); the objection may be withdrawn only with the court's approval." Fed. R. Civ. P. 23(e).  All of these requirements were satisfied here, Judge Pointer having presciently foreseen what the rule currently provides.

alleged injuries and damages not yet known or manifest) . . . related to, or involving Inamed Breast Implants that were implanted in an operation that occurred before June 1, 1993." Id. at 1-2. In addition, Order 47A expansively defined "settled claims" as follows:

> [A]ny and all Breast Implant Related claims . . . whether known or unknown, asserted or unasserted, regardless of legal theory, that are or may be asserted now or in the future by any and/or all Settlement Class Members against any or all of Inamed . . . . "Settled Claims" include, without limitation: (1) any and all claims of personal injury and/or bodily injury, damage, death, emotional or mental harm; (2) any and all claims for alleged economic or other injury or loss or for statutory damages under any state statute; (3) any and all claims for medical monitoring and claims for injunctive or declaratory relief based on, arising out of, or relating to Breast Implants; (4) any and all claims for loss of support, services, consortium, companionship, and/or society by spouses, parents, children, other relatives or "significant others" of persons implanted with Breast Implants; (5) any and all claims for conspiracy or concert of action; (6) any and all wrongful death or survival actions; and (7) any and all claims for punitive or exemplary damages based on or arising out of or related to Breast Implants.

Id. at 2. The settlement "conclusively compromised, settled and released" all "settled claims" of each member of the class. Id. at 5. Correspondingly, Order 47A permanently enjoined all members of the class "from instituting, asserting or prosecuting against Inamed . . . in any pending or future action in any federal or state court, any Settled Claim that the member had, has, or may have in the future." Id.

18

Judge Pointer made explicit that there was no just reason for delay and that Order 47A constituted a final judgment with respect to all settled claims. All questions regarding distribution of the settlement fund would be subject to subsequent orders enforcing the court's judgment, based on Judge Pointer's belief that these considerations were irrelevant to the question of whether the overall fund available was adequate. Accordingly, Order 47A states that, "[w]ithout deferring or delaying the finality of this order and judgment, this court retains exclusive and continuing jurisdiction to (1) implement, interpret, and enforce the Settlement Agreement, (2) administer, allocate, and distribute the settlement fund, and (3) rule on any applications for cost and expenses incurred in implementing this order and the Settlement Agreement." Id. No appeal was taken from Order 47A.

D. Distribution of the Settlement Fund

Order 47A merely certified the limited fund class and approved the settlement insofar as it required Inamed to infuse the settlement fund with $31.5 million. Having tabled a decision regarding a plan for allocation of the settlement recovery, Judge Pointer revisited the issue. Class counsel—including Hornsby, the attorney designated to represent solely future injury class members—presented

19

a proposed plan of fund distribution, which called for a pro rata division of the $31.5 million among all claimants, without reference to extent of injury.

In May of 1999, the court preliminarily approved the proposed distribution plan and ordered notice of it sent to approximately 350,000 implant recipients on file, of whom 45,000 were likely Inamed settlement class members. The notice requested comments and objections to the proposal. The court received sixty-two objections to the proposal. Many of the objections concentrated on the perceived inequity of the plan's failure to differentiate between claimants without injuries and claimants with current injuries. Following a July 6, 1999, hearing, Judge Pointer overruled these objections, citing the unique financial constraints affecting the settlement terms. He explained that the fund was so severely limited in relation to the number of claimants, that a distribution plan differentiating between claimants with varying degrees of injuries would have "substantially increased administrative costs," "not greatly increase[d] the amount of distribution to those determined to be eligible for enhanced benefits," and "decrease[d] even more the meager distribution to other claimants." District Court order, Docket No. 70 at 5.

In sum, Judge Pointer agreed with class counsel that pro rata division remained "the only workable solution under the facts of this case," and he approved the proposed distribution plan. Id. On July 7, 1999, he entered Order

20

47B, pursuant to which the settlement fund was promptly distributed by equal pro rata division, without reference to the extent of injuries or expenses, to eligible class members who returned satisfactory claim forms prior to October 1, 1999. Each claimant ultimately received approximately $725.  Class counsel received no fees out of the Inamed settlement fund.[11]  Order 47B was not appealed.


E. Events Following the Inamed Class Settlement

For fiscal year 1998, Inamed's net sales increased by twenty-four percent.  It reported a net income in 1998, compared to a substantial net loss in 1997. However, Inamed's book value in 1998 was still negative $15,625,000, and it remained a debt-ridden company.  By 1999, Inamed began reporting a much improved operating income, openly attributing its profitability to settling the breast implant litigation and an aggressive cost-reduction program.  On September 1, 1999, Inamed purchased Collagen Aesthetics, Inc., for approximately $159 million, the funding for which was provided by substantial borrowing. Nevertheless, even after undergoing a public offering to raise proceeds to pay the debt incurred in the purchase, Inamed's financial viability remained precarious.

---

[11]    Class counsel were ultimately paid out of a separate, common benefit account funded years earlier by a coalition of breast implant manufacturers.

Around 2002, Plaintiff Zuzanna Juris began experiencing "chronic fatigue, severe chest wall and breast pain, capsular contraction, joint and muscle pain, muscle weakness, significant weight loss, severe headaches, skin rashes, memory loss, and loss of mental acuity."  In May of 2005, a surgeon removed her implants. Upon removal, the surgeon discovered that the implants, which Juris received in 1991,[12] had deflated and leaked silicone and gel into her chest cavity and lymph nodes.  She was, according to her physician, suffering from "silicone-related immune dysfunction, atypical neurological disease and infection."

On March 23, 2006, Allergan purchased substantially all of Inamed's outstanding common stock, as well as its wholly-owned subsidiary, McGhan Medical Corporation ("McGhan").  Shortly thereafter, on May 16, 2006, Juris filed suit against Allergan, Inamed, and McGhan (hereinafter, collectively, "Allergan") in the Superior Court of California for the County of Los Angeles.  She alleged that Inamed/McGhan breast implants caused her injuries and asserted claims for strict liability, negligence, breach of express warranty, breach of implied warranty, deceit/negligent misrepresentation, and intentional infliction of emotional distress. Allergan filed a demurrer to Juris's complaint, arguing that the "doctrine of *res*

---

[12]    Juris first received breast implants in 1989.  In 1991, however, as a result of capsular contraction, a surgeon removed that set, and Juris received her second set of breast implants.

*judicata . . .* gives conclusive effect to the [Inamed] settlement and bars [Juris] from re-litigating her claims in this case." Juris responded that applying res judicata as a bar to her claims would deprive her of due process.

### F. Procedural History

On September 20, 2006, Allergan filed a motion in the district court for the Northern District of Alabama—the Inamed class action court—requesting that Juris and her attorney show cause why they should not be held in contempt for violating Order 47A's anti-suit injunction. Allergan contended that Juris was a member of the Inamed settlement class and her claims were "settled claims" as defined in Order 47A. As a result, the company argued, the settlement's injunction prohibited Juris's lawsuit. In her opposition to Allergan's contempt motion, Juris argued that she had a right to collaterally attack the class judgment and that the Anti-Injunction Act denied the district court power to enjoin the California state court action. Subsequently, on October 19, 2006, counsel for both parties jointly requested that the California court stay the proceedings before it, pending a decision from the district court. Their joint motion stated that they "agree that [Juris's] legal and constitutional challenge to Order No. 47A should be brought before the Alabama district court, and that the Los Angeles Superior

23

Court should not rule on this issue."

On October 3, 2008, District Judge U.W. Clemon traveled to California, where he heard evidence and oral argument from the parties on Allergan's show cause motion.[13] The parties filed post-hearing briefs addressing various issues. In November of 2009, Juris filed a motion in the California state court seeking a hearing and requesting that the stay be lifted, and she notified the district court of her intention to proceed with the California litigation. The district court promptly informed the parties that a second hearing would be held with respect to Allergan's motion for an order to show cause. On December 14, 2009, Judge Proctor heard oral argument from counsel representing Juris, Allergan, and the Inamed settlement class. The parties again submitted post-hearing briefs. Thus, in all, the issues before the district court were explored at two hearings and through three rounds of briefing.

Juris advanced four arguments: (1) she may raise a collateral attack against the Inamed class settlement in the forum of her choice; (2) in light of Ortiz v. Fibreboard Corp., 527 U.S. 815, 119 S. Ct. 2295 (1999), the district court erroneously certified the Inamed class under Rule 23(b)(1)(B); (3) even if

---

[13]    Notably, by this point, Judge Pointer, now deceased, was no longer presiding over the Inamed class action. The case was reassigned a number of times, and the district court order at issue in this appeal was authored by District Judge R. David Proctor.

24

correctly certified, the district court lacked personal jurisdiction over her and application of res judicata to her claims would violate her due process rights; and (4) the anti-suit injunction contained in Order 47A is unenforceable because it violates the Anti-Injunction Act. Judge Proctor considered each argument in turn.

Judge Proctor noted that, although Juris had initially argued that the California court was the only proper court to entertain her collateral challenge to the Inamed class settlement, she subsequently abandoned that position and agreed to resolve the collateral challenge in the district court in Alabama. However, in an abundance of caution, Judge Proctor nevertheless addressed the merits of the issue of the appropriate forum. Concluding that "Juris' arguments have evolved from defensive, forum-specific contentions to offensive, relief-oriented requests," Judge Proctor construed Juris's filings as a motion for relief from judgment pursuant to Federal Rule of Civil Procedure 60(b). District Court order, Docket No. 303 at 33-34. He held that the class action court properly could consider Juris's collateral challenge.

In addition, with respect to Juris's contention that Rule 23(b)(1)(B) certification was improper under the requirements outlined in Ortiz, Judge Proctor held that Juris's substantive attack on Orders 47A and 47B, which were not appealed, were foreclosed by res judicata. In the alternative, he held that "even if

25

Juris were able to contest Judge Pointer's conclusions of law . . . the Inamed Class Settlement was properly certified as a limited fund." Id. at 45.

Judge Proctor specifically rejected Juris's contention that post-settlement financial disclosures, which placed Inamed's economic status in a more positive light than the evidence presented at class certification, provided a basis for setting aside the judgment. He emphasized the fact that the reports at issue reflected Inamed's financial position *after* announcement and final approval of the settlement. He additionally observed that provisional certification of the class had an "incalculable impact" on Inamed's financial status by enjoining all litigation by the then-putative class. Most importantly, Judge Proctor found that Juris was ignoring one essential point: "If Inamed had not resolved the breast implant cases on a global scale, then the company was destined for liquidation at the direction of its senior secured creditors—a fact which Juris has never disputed." Id. at 62. Thus, Judge Proctor concluded that Juris's argument was circular; it simply made no sense to say that certification of the Inamed settlement was flawed because Inamed rebounded, when it was the settlement itself that prompted the rebound.

Judge Proctor undertook an independent analysis of Inamed's financial condition at the time of the certification, examining the evidence on which Judge Pointer had relied. Judge Proctor's analysis confirmed Judge Pointer's previous

26

findings.  Judge Proctor found that the $31.5 million settlement fund was "the maximum value available for settling the pending tort claims."  Id. at 52, 65. Judge Proctor also confirmed the earlier findings by Judge Pointer that the $31.5 million was substantially greater than the then-value of the entirety of Inamed's net assets, and that the magnitude of the claims of the class members greatly exceeded that amount.[14]

Judge Proctor then held that Juris's due process and personal jurisdiction arguments could not enable her to escape the Inamed class settlement.  As more fully developed below, Judge Proctor concluded that opt-out rights are not required in the case of a Rule 23(b)(1)(B) limited fund, Juris was adequately represented, and the class notice ordered by Judge Pointer was adequate.  Finally, Judge Proctor held that Order 47A's anti-suit injunction did not violate the Anti-Injunction Act because the injunction was necessary in aid of the court's jurisdiction and to protect or effectuate its judgments.

_____

[14]    Aside from Juris's flawed and conclusory assertions about the subsequent improvement in Inamed's financial condition, and aside from her conclusory assertion that Judge Pointer blindly accepted the settling parties valuations (an assertion squarely belied by the record), Juris fails to mount any challenge to the foregoing crucial findings of fact by both Judges Pointer and Proctor.  For example, despite full opportunity in these collateral proceedings, Juris has failed to offer any expert witness, or any other evidence at all, to challenge the undisputed facts that, in the absence of certification, Inamed was destined for a Chapter 7 bankruptcy in which the tort claimants would receive virtually nothing, that the $31.5 million settlement fund was substantially greater than the class could feasibly expect in the absence of certification, and that the settlement fund was therefore the maximum feasibly expected.

27

Accordingly, the district court granted in part and denied in part Allergan's motion for an order to show cause. Although the court declined to hold Juris or her counsel in contempt for violating Order 47A's anti-suit injunction, it held that she was bound by Judge Pointer's injunction, prohibiting her from proceeding with the California litigation. Correspondingly, the district court denied Juris's request to be excluded from the Inamed class settlement, which the court construed as a Federal Rule of Civil Procedure 60(b) motion.

## II. DISCUSSION

On appeal Juris argues: (A) that she can collaterally challenge the res judicata effect of the Inamed class settlement; (B) that the California court—not the Northern District of Alabama—is the appropriate forum for the collateral attack; and (C) that she was denied fundamental due process during the Inamed class proceedings in that (1) she did not receive adequate notice, (2) she was not adequately represented, and (3) she was denied the right to opt out. In addition, Juris seeks to escape the preclusive effect of the class settlement by arguing that Judge Pointer erred in certifying the class under Rule 23(b)(1)(B) (which we address in Part II.D). Finally, she urges us to conclude that the Anti-Injunction Act prohibited the district court from enjoining her state court suit (which we

28

address in Part II.E)

A. Availability of Collateral Attacks

Class action judgments will typically bind all members of the class. Kemp

v. Birmingham News Co., 608 F.2d 1049, 1054 (5th Cir. 1979).[15]  Thus,

"[g]enerally, principles of res judicata, or claim preclusion, apply to judgments in

class actions as in other cases." Twigg v. Sears, Roebuck & Co., 153 F.3d 1222,

1226 (11th Cir. 1998).  There is an exception to this rule, however, which is

grounded in due process. Kemp, 608 F.2d at 1054.  This Court has explained:

> Before the bar of claim preclusion may be applied to the claim of an
> absent class member, it must be demonstrated that invocation of the bar
> is consistent with due process, see, e.g., Johnson v. General Motors
> Corp., 598 F.2d 432, 435, 437 (5th Cir. 1979), and an absent class
> member may collaterally attack the prior judgment on the ground that to
> apply claim preclusion would deny him due process, see, e.g., Silber v.
> Mahon, 957 F.2d 697, 699-700 (9th Cir. 1992); Gonzales v. Cassidy,
> 474 F.2d 67, 74-75 (5th Cir. 1973), see generally Note, Collateral Attack
> on the Binding Effect of Class Action Judgments, 87 HARV. L. REV. 589
> (1974).

Twigg, 153 F.3d at 1226; see also 3 William B. Rubenstein et al., Newberg on

Class Actions § 8:30 (4th ed. 2011) ("A right of collateral attack, through which

the essential fairness of a judgment is questioned during subsequent litigation,

---

[15]    Fifth Circuit opinions issued prior to October 1, 1981, are binding precedent on
this court. Bonner v. City of Prichard, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc).

29

remains a potential limitation on the binding effect of determinations in representative actions.").

The propriety of collateral attacks "is amply supported by precedent." Stephenson v. Dow Chem. Co., 273 F.3d 249, 258 (2d Cir. 2001), aff'd in part by an equally divided court and vacated in part, 539 U.S. 111, 123 S. Ct. 2161 (2003); see Hansberry v. Lee, 311 U.S. 32, 42, 61 S. Ct. 115, 118 (1940) ("[T]here has been a failure of due process only in those cases where it cannot be said that the procedure adopted [in the representative action], fairly insures the protection of the interests of absent parties who are to be bound by it.").  Absent class members can collaterally challenge the res judicata effect of a prior class judgment either because they were not adequately represented, see, e.g., Gonzales v. Cassidy, 474 F.2d 67, 72 (5th Cir. 1973); Stephenson, 273 F.3d at 261; Van Gemert v. Boeing Co., 590 F.2d 433, 440 n.15 (2d Cir. 1978), or because there was not adequate notice, see, e.g., Twigg, 153 F.3d at 1229; Johnson v. Gen. Motors Corp., 598 F.2d 432, 434 (5th Cir. 1979); King v. S. Cent. Bell Tel., 790 F.2d 524, 530 (6th Cir. 1986); Pate v. United States, 328 F. Supp. 2d 62, 73-74 (D.D.C. 2004).  In addition, absent class members have successfully attacked a class action court's ability to bind them by arguing that they were denied the ability to opt out or exclude themselves from the class.  See, e.g., Brown v. Ticor

30

Title Ins. Co., 982 F.2d 386, 392 (9th Cir. 1992), cert. dismissed, 511 U.S. 117, 114 S. Ct. 1359 (1994).

The traditional collateral attack involves a class member commencing a separate suit on a similar subject matter as a prior class settlement, the defendant's assertion that the prior class settlement has preclusive effect and bars the new suit, and the class member's contention that giving res judicata effect to the prior settlement would violate her rights to due process. At the same time, "[a] related, collateral method for attacking judgment finality after expiration of the appeals period is available under federal Rule 60(b)." 3 William B. Rubenstein et al., Newberg on Class Actions § 8:30 (4th ed. 2011). Courts treat Rule 60(b)(4) motions, pursuant to which a litigant can seek relief from a final judgment on the grounds that "the judgment is void," as a vehicle for absent class members to advance the same due process challenges that can be raised in a traditional collateral attack. See In re Diet Drugs Prods. Liab. Litig., 431 F.3d 141, 145 (3d Cir. 2005) ("This [due process] challenge can take the form of an appeal of the class certification itself, a collateral attack on an already-certified class, or a Rule 60(b) motion."); Arthur Andersen & Co. v. Ohio (In re Four Seasons Sec. Laws Litig.), 502 F.2d 834, 842-44 (10th Cir. 1974) (analyzing due process challenge to binding effect of prior class settlement in the context of a Rule 60(b)(4) motion);

31

Battle v. Liberty Nat'l Life Ins. Co., 770 F. Supp. 1499, 1522-23 (N.D. Ala. 1991)

(same), aff'd, 974 F.2d 1279 (11th Cir. 1992). "Since the claim in both instances

is that the judgment is void and since the requirements for a valid judgment are not

altered by the setting in which validity is tested, this treatment seems logical."

Note, Collateral Attack on the Binding Effect of Class Action Judgments, 87 Harv.

L. Rev. 589, 598 n.55 (1974). The primary difference is that a Rule 60(b) motion

must be brought in the class action court, and a traditional collateral attack is

typically litigated in a second, reviewing court.[16]

---

[16] The parties have briefed an apparent split of authority with respect to the proper scope of collateral review. Some courts hold that collateral review is limited, and absent class members are not permitted to relitigate—in a collateral attack—due process arguments that were raised by class objectors and rejected by the certification court. See, e.g., Epstein v. MCA, Inc., 179 F.3d 641, 648 (9th Cir. 1999) ("Simply put, the absent class members' due process right to adequate representation is protected not by collateral review, but by the certifying court initially, and thereafter by appeal within the state system and by direct review in the United States Supreme Court."); Diet Drugs, 431 F.3d at 146 ("Once a court has decided that the due process protections did occur for a particular class member or group of class members, the issue may not be relitigated."). On the other hand, other authorities favor a more probing, broader, merits-based collateral review. See, e.g., Epstein, 179 F.3d at 652 (Thomas, J., dissenting) (stating that the court had a "responsibility to examine the merits of the [absent class members'] due process arguments fully and fairly"); Hege v. Aegon USA, LLC, 780 F. Supp. 2d 416, 429 (D.S.C. 2011) ("Having thus established that it is proper for this Court to inquire whether [absent class members] were afforded due process in [a prior class action], this Court next considers whether the notice and representation [the absent plaintiffs] received in [the prior action] were constitutionally sufficient."); Patrick Woolley, The Availability of Collateral Attack for Inadequate Representation in Class Suits, 79 Tex. L. Rev. 383, 445 (2000) (criticizing the narrow approach to collateral review and concluding that "the Constitution forbids denying an absent class member the right to collaterally attack the class judgment"). Allergan argues we should conduct a limited collateral review, urging us to affirm without reaching the merits of Juris's due process arguments because Judge Pointer considered and rejected similar arguments at class certification.

Notably, the former Fifth Circuit's binding decision in Gonzales may have already

B. Appropriate Forum for Juris's Due Process Challenge

As a preliminary matter, we must ensure that the district court was the proper forum to resolve Juris's due process challenge. Early on, in response to Allergan's contempt motion, Juris posited that she had the right to select the court where she would pursue her attack on the binding effect of the Inamed class settlement. She complained that she should not be forced to travel across the country to Alabama to litigate her constitutional challenge in the class action court. Instead, Juris maintained, she should be allowed to launch a traditional collateral attack in the California state court.

Juris relies principally on the Third Circuit's decision In re Real Estate Title & Settlement Services Antitrust Litigation, 869 F.2d 760 (3d Cir. 1989). In that case, following settlement of a multidistrict class action in the Eastern District of Pennsylvania, absent class members filed an Arizona state court action collaterally attacking the class settlement. Id. at 762. The Pennsylvania district court enjoined

decided this issue, as it apparently prescribes a broad, merits-based collateral review. See 474 F.2d at 72 (noting that the second, reviewing court must engage in a collateral review of the class action court's initial determination that the class representatives would be adequate). Regardless, to the extent it presents an open question, we need not decide the proper scope of collateral review available to Juris in this case. As will be demonstrated below, even assuming arguendo it was proper for Judge Proctor to revisit the underlying merits of each of Juris's arguments, we would affirm his holding that Juris has failed to demonstrate a violation of her due process rights.

33

the Arizona litigation, holding that if the plaintiffs wished to challenge the due process safeguards they received in the class proceeding, they could only do so in the Eastern District of Pennsylvania. Id. On appeal, the Third Circuit observed:

> In this case, the [plaintiffs] were haled across the country . . . merely because of the fortuity that plaintiffs in Pennsylvania had similar claims and the Judicial Panel on Multi-District Litigation elected to consolidate all the MDL 633 cases there. Thus we must look carefully at the protections that the [plaintiffs] were given in the class action proceeding, to assess whether it would violate due process to force them to litigate their adequacy as part of an injunction action in Pennsylvania district court.

Id. at 768. The court characterized the issue as "whether an absent class member can be *enjoined* from relitigation if the member does not have minimum contacts with the forum." Id. at 769. On this point, the court held that "if the member has not been given the opportunity to opt out in a class action involving both important injunctive relief and damage claims, the member must either have minimum contacts with the forum or consent to jurisdiction in order to be enjoined by the district court that entertained the class action." Id. Because the plaintiffs were not given an opportunity to opt out of the class settlement, did not have minimum contacts with Pennsylvania, and had not consented to jurisdiction in the Pennsylvania district court, the Third Circuit vacated the injunction; and the plaintiffs were allowed to proceed with their collateral attack in Arizona. Id.

34

Juris complains that she was similarly "haled across the country" to defend Allergan's contempt motion, even though she did not have the opportunity to opt out of the Inamed class settlement, she did not have minimum contacts with Alabama, and she did not consent to the jurisdiction of the Alabama district court. That is, she ended up litigating in Alabama by nothing more than the "fortuity" that, years earlier, thousands of lawsuits related to silicone breast implants were consolidated by the Judicial Panel on Multidistrict Litigation and transferred to the Northern District of Alabama. Juris contends that the California state court action should have been allowed to proceed to decide whether she was afforded due process in the Inamed class settlement. We cannot agree.

First, Real Estate did not involve a limited fund class action. The prior settlement in that case involved a "hybrid class," which sought substantial damages, but primarily injunctive relief, certified pursuant to Rule 23(b)(1)(A) and Rule 23(b)(2). Id. at 764, 768. The Third Circuit limited its holding to the facts before it, stating that it was not "address[ing] the due process requirements in a class action certified under 23(b)(1)[B] in which there is only a limited common fund from which the plaintiffs can obtain relief."[17] Id. at 768 n.8. Thus, even if

---

[17]    The Third Circuit's express qualification suggests that the due process considerations in a limited fund class actions might yield a different outcome. At least one district court in that circuit has distinguished Real Estate on this basis. See Fanning v. Acromed

35

Real Estate were binding authority in this Circuit, that decision would not control our analysis because the case at bar involves a limited fund.

Second, and more importantly, we hold that Juris consented to jurisdiction in the court below.[18] Juris and Allergan filed a consent motion to stay the California case, which stated that they "agree that [Juris's] legal and constitutional challenge to Order No. 47A should be brought before the Alabama district court, and that the Los Angeles Superior Court should not rule on this issue." The joint motion similarly provided: "To the extent Plaintiff intends to pursue a constitutional challenge to Order 47A, Plaintiff and Defendants agree that the Northern District of Alabama is the proper court to interpret and review said order, and to determine its effect on Plaintiff's claims herein." In support, Juris's counsel filed a sworn declaration explaining that "[c]ounsel for the Plaintiff and counsel for the Defendants, including their respective local Alabama counsel, have jointly agreed to seek to resolve the legal and constitutional issues related to Plaintiff's commencement of the above-entitled action before the federal court in

---

Corp. (In re Orthopedic Bone Screw Prods. Liab. Litig.), 176 F.R.D. 158, 180-81 (E.D. Pa. 1997).

[18]    Significantly, whether Juris consented to having the district court—i.e., Judge Proctor's court—rule on her due process challenges is an inquiry separate from whether the district court—i.e., Judge Pointer's court—had jurisdiction to adjudicate Juris's claims as part of the Inamed class action over a decade earlier. We address the latter issue below.

36

Alabama."[19]

Given her express consent, we have no difficulty concluding that the

Alabama district court was the proper forum to resolve Juris's constitutional

challenge to the res judicata effect of the Inamed class settlement.  Juris cannot

now be heard to complain that she was "haled across the country" to a forum for

which she did not have minimum contacts or consent to jurisdiction.  We do not

reach the issue left open by the Third Circuit in Real Estate—whether, in the

absence of her express consent to jurisdiction, it would have run afoul of the due

process clause to require Juris to litigate her collateral attack on the limited fund

settlement in the certifying court.[20]

_____

[19]    Although Juris initially pressed her forum choice argument, she abandoned it in the district court.  In a post-hearing reply brief, Juris's counsel acknowledged that she consented to having the district court decide her due process challenge, stating that, "[d]espite Plaintiff's continuing belief that the California court could properly address the issue of whether Plaintiff's claims were barred by *res judicata*, out of deference for [District] Judge Clemon Plaintiff Juris and her counsel nonetheless agreed that this Court could rule on the issue in the first instance." Juris's subsequent briefs altogether dropped the argument that her collateral attack should proceed in the California court.  Thus, Judge Proctor held that Juris "appears to have abandoned" her earlier choice of the California forum and "has now apparently consented to this court's jurisdiction."  District Court order, Docket No. 303 at 35. We agree both that she abandoned the issue in the district court and, in any event, that she had expressly consented to the jurisdiction of that court to rule on her collateral challenge.

[20]    We therefore need not decide whether Judge Proctor properly construed our decision in Battle v. Liberty National Life Insurance Co., 877 F.2d 877 (11th Cir. 1998), to be in conflict with the Third Circuit's decision in Real Estate.  We also note that the unique procedural posture of this case closely parallels that in Adams v. Southern Farm Bureau Life Insurance Co., 493 F.3d 1276 (11th Cir. 2007).  There, the defendant filed a "Motion to Enforce Final Judgment" in the Middle District of Georgia, arguing that a 1999 class settlement approved by that court barred two Mississippi state court actions that were filed in 2005.  Id. at 1278.  The

C. Juris's Due Process Arguments

1. Adequate Notice

Juris argues that the Inamed settlement should not be given res judicata

effect because she did not receive adequate notice of the class proceedings.  She

does not challenge the class judgment on the theory that the *content* of the notices

was constitutionally inadequate.  See Twigg v. Sears, Roebuck & Co., 153 F.3d

1222, 1227 (11th Cir. 1998) (concluding that prior class judgment could not bar

absent class member's claims because, "even if Twigg had received the notices,

their language was insufficient to notify him that claims like his were being

litigated in the action").  Rather, her due process argument takes aim at the method

of distributing class notice approved by Judge Pointer.  Juris specifically urges us

to find that the class notice was constitutionally deficient because she did not

receive actual, individual notice.[21]

---

motion to enforce sought in part to enjoin the Mississippi litigation.  Id.  In opposition, the state
court plaintiffs contended that they did not receive adequate notice in the prior class action, and
therefore, permitting the class settlement to have res judicata effect would be inconsistent with
due process.  Id. at 1285.  The class action court resolved the collateral challenge, holding there
were no due process violations, although neither the district court nor the Eleventh Circuit
addressed the issue of the appropriate forum.  Id. at 1289.

[21]    In the district court, relying on Amchem Products, Inc. v. Windsor, 521 U.S. 591,
117 S. Ct. 2231 (1997), Juris contended that "meaningful notice for 'future' claimants, such as
Juris was, in fact, impossible."  In Amchem, although it did not decide the issue, the Supreme

38

The notice provisions of Rule 23, which are meant to protect the due process rights of absent class members, set forth "different notice requirements to different kinds of cases and even to different phases of the same case." Battle v. Liberty Nat'l Life Ins. Co., 770 F. Supp. 1499, 1515 (N.D. Ala. 1991), aff'd, 974 F.2d 1279 (11th Cir. 1992). The rule itself does not require notice in Rule 23(b)(1) and (b)(2) class actions. See Fed. R. Civ. P. 23(c)(2)(A)-(B). Instead, in these "mandatory" class actions, Rule 23 allows courts to exercise their discretion to provide appropriate notice "to protect class members and fairly conduct the action." Fed. R. Civ. P. 23(c)(2)(A), (d)(1)(B); see also 3 William B. Rubenstein et al., Newberg on Class Actions § 8:5 (4th ed. 2011) ("[T]he court may make

_____

Court questioned whether constitutionally sufficient class notice could ever be given to exposure-only asbestos tort claimants. Id. at 628, 117 S. Ct. at 2252. The Court emphasized that many exposure-only individuals "may not even know of their exposure, or realize the extent of the harm they may incur." Id. Judge Pointer rejected this argument when raised by class objectors in 1998, and Judge Proctor did the same. According to Judge Proctor, unlike exposure-only asbestos tort claimants, who may not know of their exposure until they contract asbestos-related illnesses, all breast implant recipients—whether they have manifested injuries or not—know that they have had implants and are capable of being notified. Judge Proctor was additionally persuaded that the Amchem court's concern that "those without current afflictions may not have the information or foresight needed to decide, intelligently, whether to stay in or opt out," id., is inapplicable in a non-opt-out class action.

We need not in this case decide whether Judge Proctor's reasoning, and his distinction of Amchem, was sound, because Juris has not fairly raised the issue on appeal. Notwithstanding her briefs in the court below and the fact that she discussed this potential notice issue during oral argument, Juris did not sufficiently develop this argument in her appellate briefs and has therefore abandoned it. See McFarlin v. Conseco Servs., LLC, 381 F.3d 1251, 1263 (11th Cir. 2004) ("A party is not allowed to raise at oral argument a new issue for review."); Marek v. Singletary, 62 F.3d 1295, 1298 n.2 (11th Cir. 1995) ("Issues not clearly raised in the briefs are considered abandoned.").

appropriate orders requiring notice to some or all of the members regarding the pendency of the class, proposed judgment or settlement, soliciting input on the adequacy of class representation, opportunity to intervene or present claims or defenses, and the like."). "Regardless of the category under which a class suit may be or potentially may be certified, however, Rule 23(e) requires that absent class members be informed when the lawsuit is in the process of being voluntarily dismissed or compromised." Id. § 8:17; see Fed. R. Civ. P. 23(e)(1).

Under certain circumstances, however, even when not provided for by Rule 23, due process may require that class members receive notice of the pendency of the proceeding. See, e.g., Johnson v. Gen. Motors Corp., 598 F.2d 432, 437 (5th Cir. 1979) (holding that due process required notice, "[a]lthough under the text of Rule 23 and the cases interpreting it notice is not required in all representative suits"). Although other courts have held that adequate representation alone is a sufficient test for assessing due process in the context of a limiedt fund class action, see, e.g., Flanagan v. Ahearn (In re Asbestos), 90 F.3d 963, 986-87 (5th Cir. 1996), rev'd on other grounds sub nom. Ortiz v. Fibreboard Corp., 527 U.S. 815, 119 S. Ct. 2295 (1999), we have held that due process will additionally require at least *some* notice to potential absent members prior to class certification under Rule 23(b)(1)(B). See In re Temple, 851 F.2d 1269, 1272 (11th Cir. 1988).

40

In Temple, an asbestos manufacturer moved to consolidate all present and future asbestos-related injury actions against it and to certify a mandatory class action. Id. at 1270. The company asserted that certification was warranted under Rule 23(b)(1)(B) because its assets constituted a limited fund in the sense that they were insufficient to satisfy all claims. Id. at 1271. Without notifying any putative class members or conducting an adversarial proceeding on the existence of a limited fund, the district court accepted the defendant's assertions. Id. The district court found that the company's insurance and other funds would not be able to cover its potential tort liability, and it observed that the costs of defending numerous small actions were rapidly depleting the company's resources. Id. On appeal, we held that the certification was due to be reversed because, *inter alia*, "[t]he [district] court's failure to notify petitioners of the certification hearing violated due process." Id. at 1272. We reasoned that, "[u]nlike class members in cases certified under 23(b)(3) who may opt out of the action and have no need for prior notice of efforts to obtain class certification, members of a mandatory class need to be provided with notice to contest the facts underlying a certification they may strenuously oppose." Id. The lack of notice produced a non-adversarial proceeding that "almost certainly led to the premature and speculative finding that a limited fund existed." Id. Therefore, we held, the district court's order "clearly

41

violate[d] the individual constitutional rights of the petitioners." Id.

The due process violation in Temple arose because the district court certified a mandatory, limited fund class action without *any* notice to absent class members. The decision does not stand for the proposition that the Constitution requires that each individual class member receive actual notice. Instead, our concern was with the total absence of notice, which led to the "non-adversarial nature of the [class certification] proceedings." Id. at 1272. We therefore agree with the district court that Temple is not controlling in this case. Where the notice afforded reaches a critical mass of putative class members, such that the facts underlying certification are contested and approached in a sufficiently adversarial manner, the due process pitfall identified in Temple can be avoided.

The careful analysis of the notice mandated by due process in Battle, 770 F. Supp. 1499, is also persuasive here.[22] In that case, years after a class settlement, absent members sought to circumvent the prior judgment on the theory that it violated their due process rights to actual, personal notice. Battle, 770 F. Supp. at 1508, 1510. Although the court stopped short of holding that no notice at all would have passed constitutional muster, it concluded that individual notice to

---

[22]    In our opinion affirming the trial court's decision in Battle, we stated only that we were "not presented with any reversible error on the part of the district judge." 974 F.2d at 1279.

42

certain class members as well as certain "media" notice "was enough to subsequently bind this 23(b)(2)-type plaintiff class . . . consistent with due process." Id. at 1519-20. The court reasoned:

> Because such notice was appropriately designed not to afford absent members the chance to exclude themselves from the class, but rather to inform them of the pendency of the action and permit them to challenge the representation by the named plaintiffs and class counsel or to otherwise intervene, the fact that paid-up policyholders did not receive notice did not frustrate this purpose. Because such policyholders shared the same interests as those who did receive notice, the latter could adequately speak for them vis-a-vis the named plaintiffs and class counsel.

Id. at 1520 (citation omitted). As such, Battle holds that when a mandatory class is composed of plaintiffs with singular interests, and where the representatives and objectors reflect the interests of those who did not receive notice, failure to individually notify each class member will not equate to a constitutional violation.[23]

To the extent that Temple and Battle require notice to ensure that the class certification and the underlying facts supporting it are sufficiently scrutinized and

---

[23] This notion is consistent with the understanding of the drafters of the 1966 amendments to Rule 23. The drafters explained that, "[i]n the degree that there is cohesiveness or unity in the class and the representation is effective, the need for notice to the class will tend toward a minimum." Fed. R. Civ. P. 23, supplementary note of advisory committee on 1966 Amendment; see also 7AA Charles Alan Wright et al., Federal Practice & Procedure § 1786 (3d ed. 2005) ("In representative actions brought under [Rule 23(b)(1) and (b)(2)], the class generally will be more cohesive. . . . This means there is less reason to be concerned about each member of the class having an opportunity to be present.").

to ensure that the varied interests of non-participating class members are represented, notice in the present case was sufficient to satisfy due process. Judge Pointer directed individual notices to be mailed to 250,000 women who had registered with the claims office and 28,000 attorneys representing Inamed breast implant recipients. He also ordered that notice of the proposed settlement and the certification-fairness hearing be published in People Magazine, USA Today, and Modern Healthcare Magazine, as well as on Modern Healthcare Magazine's website and the district court's website. At the certification-fairness hearing, potential class members—including those with no manifested injury—objected, arguing among other things that the settlement fund was too small, that the named class representatives did not adequately reflect the putative class members' varying degrees of injuries, that future claimants should be allowed to opt-out of the class, that the settlement would improperly sidestep the bankruptcy system, and that Inamed did not constitute a limited fund in light of the company's economic rebound. The hearing was far different from "[t]he district court's ex parte proceeding" in Temple, which "denied petitioners their right to contest [the asbestos company's] assertions." 851 F.2d at 1272. The proceedings before Judge Pointer were sufficiently adversarial.

Even with the benefit of hindsight, Juris cannot point to a single objection

44

that she would have raised that was not actually advanced by putative class members before Judge Pointer. Accordingly, the ordered notice amply satisfied the requirements of Temple and Battle that absent class members be sufficiently informed of the pendency of the action.[24]

We likewise find that the notice with respect to the proposed plan for distribution of the Inamed settlement fund satisfied due process. See Battle, 770 F. Supp. at 1520 (explaining that, apart from notice of the pendency of the action, a court must analyze whether class members received constitutionally sufficient notice of and the right to object to the settlement). Per Judge Pointer's orders, notices requesting objections and comments on the proposed fund distribution plan were mailed to 350,000 implant recipients registered with the claims office. The court received sixty-two objections to the proposal, and Judge Pointer held a

---

[24] Class counsel have suggested that extensive paid notice associated with the failed Original Global Settlement, which resulted in 500,000 women registering with the MDL 926 claims office, as well as the informal notice stemming from the enormous volume of news stories about breast implant litigation, further increased exposure to the Inamed class settlement. Because we find that the formal notice campaign approved by Judge Pointer was sufficient, we need not address the precise constitutional significance of this "other" notice. See In re Agent Orange Prod. Liab. Litig., 818 F.2d 145, 169 (2d Cir. 1987) (taking judicial notice of the widespread publicity that litigation received and concluding that "the omissions noted were of little consequence in light of the actual notice and widespread publicity"); Battle, 770 F. Supp. at 1520 (finding individual notice to some class members and "certain 'media' notice in the Birmingham area" was enough to bind absent class members); 7AA Charles Alan Wright et al., Federal Practice & Procedure § 1786 (3d ed. 2005) (noting that courts have suggested that Rule 23 "does not require publication to be accomplished through formal newspaper advertisements," and citing cases in which "widespread notoriety given to the case" and "attention given the action by the news media" were held to provide adequate notice).

hearing to consider the propriety of pro rata distribution of the fund. For example, Judge Pointer addressed concerns that the plan was inequitable because it failed to differentiate between claimants with current injuries and those without injuries; he also overruled objections that certain claimants could not identify the manufacturer of their breast implants and thus could not provide the necessary information to be eligible to claim from the Inamed settlement fund. Judge Pointer was not required to provide each absent class member individual notice of the proposed settlement allocation plan, and the notice here satisfied "the broad reasonableness standards imposed by due process." Fowler v. Birmingham News Co., 608 F.2d 1055, 1059 (5th Cir. 1979); see also Franks v. Kroger Co., 649 F.2d 1216, 1222-23 (6th Cir. 1981), aff'd on reh'g, 670 F.2d 671 (1982). Importantly, under the circumstances, "the interests of those class members . . . who did receive notice of the settlement were essentially identical to the interests of [those] who were not alerted to the settlement . . . and the former raised just the sort of objections that the latter would have raised ." Battle, 770 F. Supp. at 1521.

Juris's conclusory assertion that the Inamed class settlement cannot be given preclusive effect because "[t]here is no dispute that she did not receive actual notice" rests on a faulty premise. As demonstrated by our discussion of Temple and Battle, where due process calls for absent members of a mandatory class to

46

receive notice, it does not *automatically* require that the notice match that in a 23(b)(3) class action.  That is, something less than "the best notice that is practicable under the circumstances, including individual notice to all members who can be identified through reasonable effort," may suffice.  Fed. R. Civ. P. 23(c)(2)(B); see also 3 William B. Rubenstein et al., Newberg on Class Actions § 8:13 (4th ed. 2011) ("As a rule, class certification notice, even if held to be required in a Rule 23(b)(1) . . . class suit by . . . due process, will invariably mean significant cost savings by means of published or other general notice, compared to the corresponding but stricter requirements of individual Rule 23(c)(2) notice to members of classes certified only under Rule 23(b)(3)."); Johnson v. Gen. Motors Corp., 598 F.2d 432, 438 (5th Cir. 1979) (holding that individual monetary claims in a 23(b)(2) class cannot be barred where absent class members received no notice, but stating that "[i]t will not always be necessary for the notice in such cases to be equivalent to that required in (b)(3) actions").

However, even assuming this heightened standard applied, Juris would be unable to demonstrate that the notice in the class proceeding was constitutionally deficient.  Courts have consistently recognized that, even in Rule 23(b)(3) class actions, due process does not require that class members actually receive notice.  See Silber v. Mabon, 18 F.3d 1449, 1453-54 (9th Cir. 1994) (explaining that even

47

in an opt-out class action, class notice standard is "best practicable," as opposed to "actually received"); Adams v. S. Farm Bureau Life Ins. Co., 417 F. Supp. 2d 1373, 1380 n.6 (M.D. Ga. 2006) ("The analysis for purposes of due process is on the notice plan itself, and actual receipt of notice by each individual class member is not required."), aff'd, 493 F.3d 1276 (11th Cir. 2007); In re Prudential Sec. Inc. Ltd. P'ships Litig., 164 F.R.D. 362, 368 (S.D.N.Y. 1996), ("It is widely accepted that for the due process standard to be met it is not necessary that every class member receive actual notice . . . ."), aff'd, 107 F.3d 3 (2d Cir. 1996); Trist v. First Fed. Sav. & Loan Ass'n of Chester, 89 F.R.D. 1, 2 (E.D. Pa. 1980) ("Mullane[ v. Ctr. Hanover Bank & Trust Co., 339 U.S. 306, 313, 70 S. Ct. 652, 656 (1950),] has never been interpreted to require the sort of actual notice demanded by the defendants . . . ."); see also 4 William B. Rubenstein et al., Newberg on Class Actions § 11:53 (4th ed. 2011) ("Thus, due process does not require actual notice, but rather a good faith effort to provide actual notice.  Courts have consistently recognized that due process does not require that every class member receive actual notice so long as the court reasonably selected a means likely to apprize interested parties."); 7AA Charles Alan Wright et al., Federal Practice & Procedure § 1789.1 (3d ed. 2005) ("[A]s long as the notice scheme that is adopted meets [the constitutional standards], courts generally have ruled that an absent

48

class member will be bound by any judgment that is entered, even though the absentee never actually received notice."). Where certain class members' names and addresses cannot be determined with reasonable efforts, notice by publication is generally considered adequate. See In re Agent Orange Prod. Liab. Litig., 818 F.2d 145, 168-69 (2d Cir. 1987) (finding that, with respect to a 23(b)(3) class, unidentified absent class members that could not be located through reasonable efforts did not need to be provided with individual, mailed notice in order to be bound); Gordon v. Hunt, 117 F.R.D. 58, 63 (S.D.N.Y. 1987) ("This combination of mailed notice to all class members who can be identified by reasonable effort and published notice to all others is the long-accepted norm in large class actions."). Juris cites no case law to the contrary.

Judge Pointer constructed a notice campaign which he intended to approximate the level of notice that would have been provided to a Rule 23(b)(3) class. Juris has done nothing to call into question the fact that the dissemination of notice was—as Judge Pointer intended, and Judge Proctor later found—the best practicable under the circumstances. We hold that the notice campaign in the Inamed class action was sufficient in a constitutional sense, and we cannot conclude that there was a deficiency in notice that prevents res judicata from attaching to the class settlement.

49

2. Adequate Representation

Juris additionally seeks to circumvent the binding effect of the Inamed class settlement on the basis that she was not adequately represented.  She claims she was inadequately represented for several reasons; we address her arguments in turn.

"Due process of law would be violated for the judgment in a class suit to be res judicata to the absent members of a class unless the court applying res judicata can conclude that the class was adequately represented in the first suit."  Gonzales v. Cassidy, 474 F.2d 67, 74 (5th Cir. 1973).

> To answer the question whether the class representative adequately represented the class so that the judgment in the class suit will bind the absent members of the class requires a two-pronged inquiry: (1) Did the trial court in the first suit correctly determine, initially, that the representative would adequately represent the class? and (2) Does it appear, after the termination of the suit, that the class representative adequately protected the interest of the class?  The first question involves us in a collateral review of the [class action] court's determination to permit the suit to proceed as a class action with [the named plaintiffs] as the representative[s], while the second involves a review of the entire suit—an inquiry which is not required to be made by the trial court but which is appropriate in a collateral attack on the judgment such as we have here.

Id. at 72.

Juris argues that Judge Pointer erred by failing to create discrete subclasses for those breast implant recipients with current injuries and those with only

50

potential, future injuries.  She relies primarily on Amchem Products, Inc. v.

Windsor, 521 U.S. 591, 117 S. Ct. 2231 (1997).  In Amchem, the Supreme Court

analyzed, on direct appeal, the certification of a settlement-only class action

involving persons exposed to asbestos products.  The "sprawling class" included

not only presently injured individuals, but also those who had only been exposed

to asbestos with no present manifestation of injury.  Id. at 602-03, 117 S. Ct. at

2239-40.  The Court reversed class certification, noting, among other defects, that

Rule 23(a)(4)'s requirement that the named representatives "will fairly and

adequately protect the interests of the class" had not been satisfied.  Id. at 625, 117

S. Ct. at 2250.  Importantly, the Court reasoned:

> [N]amed parties with diverse medical conditions sought to act on behalf
> of a single giant class rather than on behalf of discrete subclasses.  In
> significant respects, the interests of those within the single class are not
> aligned.  Most saliently, for the currently injured, the critical goal is
> generous immediate payments.  That goal tugs against the interest of
> exposure-only plaintiffs in ensuring an ample, inflation-protected fund
> for the future.

Id. at 626, 117 S. Ct. at 2251.

Quoting from a Second Circuit decision, the Court shed light on its precise

concern:  "The class members may well have thought that the Settlement serves

the aggregate interests of the entire class.  But the adversity among subgroups

requires that members of each subgroup cannot be bound by a settlement except

51

by consents given by those who understand that their role is to represent solely members of their respective subgroups." Id. at 627, 117 S. Ct. at 2251 (quoting In re Joint E. & S. Dist. Asbestos Litig., 982 F.2d 721, 742-43 (2d Cir. 1992), modified on reh'g, 993 F.2d 7 (2d Cir. 1993)). The crux of the problem in Amchem was that there was "no assurance . . . either in the terms of the settlement or in the structure of the negotiations—that the named plaintiffs operated under a proper understanding of their representational responsibilities." Id.; see id. ("The settling parties, in sum, achieved a global compromise with no structural assurance of fair and adequate representation for the diverse groups and individuals affected.").

Two years later, in Ortiz v. Fibreboard Corp., 527 U.S. 815, 119 S. Ct. 2295 (1999), the Court again discussed the potentially conflicting interests within a class of current and future injury asbestos claimants certified for global settlement purposes. Id. at 856, 119 S. Ct. at 2319. According to the Court, under the law of Amchem, "a class divided between holders of present and future claims (some of the latter involving no physical injury and attributable to claimants not yet born) requires homogenous subclasses under Rule 23(c)[], with separate representation to eliminate conflicting interests of counsel." Id. Ortiz involved Rule 23(b)(1)(B) certification requirements, as opposed to Rule 23(a)(4), but the Court found that

52

the intra-class conflict was "as contrary to the equitable obligation entailed by the limited fund rationale as it was to the requirements of structural protection applicable to all class actions under Rule 23(a)(4)." Id. at 856, 119 S. Ct. at 2320; see id. at 856 n.31, 119 S. Ct. at 2319 n.31 (noting that the Rule 23(b) "adequacy of representation concern parallels the enquiry required at the threshold under Rule 23(a)(4)").

The cases describe a requirement that there be structural assurances of adequate representation that protect against the conflicting goals of present and future injury class members. These protections must ensure that class representatives understand that their role is representing solely members of their respective constituency, not the whole class. Although we need not rule definitively, Amchem and Ortiz appear to hold that Rule 23(a)(4) calls for *some type* of adequate structural protection, which would include, but may not necessarily require, formally designated subclasses.[25] Of course, both Amchem

---

[25]     We are not the first court to suggest that Amchem and Ortiz impose a requirement of adequate structural assurances, as opposed to a per se requirement of formally designated subclasses. For example, in In re Literary Works in Electric Databases Copyright Litigation, 654 F.3d 242 (2d Cir. 2011), after noting that an Amchem conflict was present, the Second Circuit considered whether certain protections, including the fact that the settlement was the product of "intense, protracted, adversarial mediation, involving multiple parties and complex issues," were sufficient to satisfy Rule 23(a)(4). Id. at 252. Although the court ultimately concluded that these protections did not provide sufficient assurance of adequate representation, its analysis of the issue is revealing. See id. at 251-55; see also Stephenson v. Dow Chem. Co., 273 F.3d 249, 261 n.9 (2d Cir. 2001) (describing the problem in Amchem and Ortiz as a "lack of procedural

and Ortiz involved review on direct appeal of the Rule 23 pre-certification requirements, as opposed to the collateral challenge context of our case in which Juris must show that her due process rights were violated.  In the context of this case, we are unwilling to hold that the *due process* concept of adequate representation is so rigid and inflexible as to demand formal subclasses in the case at bar.

Judge Pointer and class counsel put in place procedures to protect against antagonistic alignment within the class and avoid the fatal flaw in Amchem. Judge Pointer appointed six Inamed breast implant recipients as class representatives, among them, a representative with no manifested injury, one with minor to moderate injuries, and one who was totally disabled.  He appointed five

---

safeguards like subclasses"), aff'd in part by an equally divided court and vacated in part, 539 U.S. 111, 123 S. Ct. 2161 (2003).  Commentators have also suggested (or at least implied) that the certification of subclasses is just one example of structural protection capable of ensuring adequate representation in the face of intra-class conflicts.  See, e.g., 1 William B. Rubenstein et al., Newberg on Class Actions § 3:61 (5th ed. 2011) (noting that "subclasses or other managerial mechanisms can be employed to resolve the potential conflict"); 2 John F.X. Peloso et al., Business and Commercial Litigation in Federal Courts § 19:106 (3d ed. 2011) ("The Supreme Court suggested that some of the problems noted in the proposed class could have been resolved by procedural devices, such as the use of subclasses, each with independent representatives and counsel."); 1 Joseph M. McLaughlin, McLaughlin on Class Actions § 4:45 (8th ed. 2011) ("Thus, Amchem suggested that the adequate representation requirement may be satisfied notwithstanding differences among subclasses within a class if there is some form of 'structural assurance of fair and adequate representation . . . .'"); Note, Kevin R. Bernier, The Inadequacy of the Broad Collateral Attack: Stephenson v. Dow Chemical Company and its Effect on Class Action Settlements, 84 B.U. L. Rev. 1023, 1042 (2004) ("Therefore, Ortiz and Amchem do not stand for a per se rule against settlements that do not include subclasses, but rather require a demand for strong procedural protection at the certifying level.").

attorneys with extensive breast implant trial experience as class counsel. Most significantly, and anticipating an Amchem problem, separate counsel, Ernest Hornsby, was specifically brought in for the sole purpose of representing those plaintiffs with only potential, future injuries. Thus, even prior to provisional certification of the class, the interests of those claimants with unmanifested injuries were represented and given a separate seat at the negotiation table through qualified and independent counsel.[26] Hornsby continued his representation of exposure-only plaintiffs throughout the case, including when, at the certification stage, Judge Pointer considered approving the settlement and the settlement fund, and, more significantly, later, when he considered various proposals for allocating

---

[26]    Judge Pointer found that there were no conflicts among the class representatives or class counsel at certification. He believed that all class members had a common, overriding interest in identifying and preserving a limited fund that provided the maximum possible recovery for all; divergent interests would occur, if at all, during the later stages of the case in which the court would take up the issue of how to distribute the settlement fund. We agree that the interests of the Inamed class members were in complete alignment at certification. The present circumstances are therefore unlike those in Amchem, where the proposed class settlement, which was negotiated by lawyers who had no attorney-client relationship with future claimants, made essential allocation decisions as to how the recovery was to be allocated among various types of plaintiffs. 521 U.S. at 610, 117 S. Ct. at 2243. Here, the goal of the currently injured did not "tug against" the goal of the exposure-only plaintiffs until the court considered, post-certification, the proper method of distribution. See Kohen v. Pac. Inv. Mgmt. Co., 571 F.3d 672, 680 (7th Cir. 2009) ("At this stage in the litigation the existence of such conflicts is hypothetical. If and when they become real, the district court can certify subclasses with separate representation of each."); 1 William B. Rubenstein et al., Newberg on Class Actions § 3:58 (5th ed. 2011) (explaining that potential conflicts over distribution will not bar an initial finding of adequacy at class certification, and that the court can resolve conflicts over distribution through the use of subclasses at a later stage). Adequate structural protections were in place well before that time.

55

the fund.  This combination of named plaintiffs representing the full spectrum of breast implant claimants and separate counsel to represent the present injury and future injury claimants addressed the potential and actual divergent interests within the Inamed class.

In contrast with Amchem and Ortiz, the structure of the negotiations in the case at bar ensured that class representatives operated with a proper understanding of their representative responsibilities.  The negotiation process did not resemble that in Amchem and Ortiz where there were no structural assurances whatsoever and where nobody "exclusively advanced the particular interests of either subgroup."  In re Literary Works in Elec. Databases Copyright Litig., 654 F.3d 242, 250 (2d Cir. 2011).  Because of this, we are confident that the class settlement, as well as the plan for distribution, was achieved only by the consent of those who understood that their role was to advocate on behalf of their respective subgroups.[27]  We therefore conclude that the structural protections put in place

---

[27]    We emphasize that class counsel's behavior is directly intertwined with that of the named plaintiffs.  See, e.g., Pelt v. Utah, 539 F.3d 1271, 1288 (10th Cir. 2008) ("Realistically, for purposes of determining adequate representation, the performance of class counsel is intertwined with that of the class representative."); Culver v. City of Milwaukee, 277 F.3d 908, 913 (7th Cir. 2002) ("For purposes of determining whether the class representative is an adequate representative of the members of the class, the performance of the class lawyer is inseparable from that of the class representative. . . .  Realistically, functionally, practically, [the class lawyer] is the class representative, not [the class representative]."); Greenfield v. Villager Indus., Inc., 483 F.2d 824, 832 n.9 (3d Cir. 1973) ("Experience teaches that it is counsel for the class representative and not the named parties, who direct and manage these actions.  Every

56

were sufficient to meet the demands of due process.

Our holding that formal subclasses were not constitutionally required is reinforced by Judge Proctor's unchallenged findings. According to Judge Proctor, "the class's court-appointed representatives and counsel served as the functional equivalents of formally sub-classed groups, which ensured that the class representatives, as well as their counsel, participated directly in negotiations and litigation." District Court order, Docket No. 303 at 93. He additionally found that formal sub-classing would have been "superfluous" because Judge Pointer received objections that mirrored the concerns that subdivided "currents" and "futures" subclasses likely would have produced respectively. Id. at 95. On appeal, Juris does not contest Judge Proctor's findings, and she has not articulated how formal subclasses would have provided increased assurance of adequate representation.

Juris does argue that "Hornsby did not, and could not, vigorously and tenaciously protect the plaintiff's interests" because "Hornsby represented all kinds of plaintiffs in the Inamed litigation—those who had no current injuries, some who had current injuries, and some who were going to develop a condition

experienced federal judge knows that and any statements to the contrary is [sic] sheer sophistry.").

57

or disease in the future." Juris's initial appellate brief makes this conclusory assertion, without even labeling it a conflict of interest, and provides no follow-up argument on the issue.[28] Even more problematic, Juris has raised this claim for the first time on appeal.

"A federal appellate court will not, as a general rule, consider an issue that is raised for the first time on appeal." In re Pan Am. World Airways, Inc., 905 F.2d 1457, 1461-62 (11th Cir. 1990). "The corollary of this rule is that, if a party hopes to preserve a claim, argument, theory, or defense on appeal, she must first clearly present it to the district court, that is, in such a way as to afford the district court an opportunity to recognize and rule on it." Id. at 1462. In her appellate briefs, Juris cites to a portion of the hearing before Judge Proctor in which Hornsby made a stray remark that, at the beginning, he represented some breast implant plaintiffs with current injuries and some with no manifested injuries.[29] Juris's counsel did not respond, at that point or any other point during the hearing,

---

[28] In her reply brief, Juris again makes mention of "Hornsby's representation of class members with both present illnesses and future claims." Although that brief labels Hornsby's alleged dual representation a conflict of interest for the first time, Juris again failed to provide any follow-up discussion or elaborate on her assertion.

[29] Hornsby stated as follows: "Well, as I said, when I came in, I came in with a real bias against [the limited fund settlement]. I represented people that were going to be adversely affected by it just like Miss Juris, some who had no current injuries, some who had current injuries, and some who were going to develop a condition or disease in the future . . . ."

58

by arguing that Hornsby had a conflict of interest which deprived Juris of adequate representation.[30]  Most importantly, Juris discussed adequate representation in five briefs in the court below, and she never once suggested that Hornsby suffered from a conflict of interest.

Having foregone an opportunity to explore Hornsby's representation before Judge Proctor (at which time the matter could have been investigated and clarified), and having raised the conflict-of-interest claim in such a vague and tangential manner on appeal, Juris has waived it.  Having doubly waived the conflict of interest issue, and especially having deprived Allergan of the opportunity to adduce evidence to clarify the situation, Juris is deemed to have abandoned the issue.  See id. at 1461-62; Marek v. Singletary, 62 F.3d 1295, 1298 n.2 (11th Cir. 1995).

Even setting aside Juris's abandonment of this issue, we would hold that the record amply supported Judge Proctor's finding that counsel in this case served as the functional equivalents of formal subclasses, such that the situation falls far short of a due process violation.  The record reveals that the parties agreed, and Judge Pointer was aware, that Hornsby represented solely future claimants with no

---

[30]    In fact, at that same hearing, "Juris's counsel conceded . . . that there is absolutely nothing in the record to suggest that Hornsby, acting as Class Counsel on behalf of future claimants, suffered from a conflict of interest."  District Court order, Docket No. 303 at 96.

current manifestations of injury.  An affidavit submitted by class counsel in support of provisional certification of the Inamed settlement class provides as follows:

> One concern that we raised and explored, as discussions and negotiations proceeded, was whether breast implant recipients with manifest injuries, and those who have not yet suffered injuries from their implants, had a common interest in a mandatory fund settlement as opposed to the inevitable alternative of Inamed insolvency.  To assure that all interests and perspectives were represented, Ernest Hornsby, a plaintiffs' attorney with extensive Breast Implants trial experience, who represents Inamed implant recipients with potential future claims, was added as class counsel in this action, and participated in the final round of discussions and negotiations that led up to the instant settlement.

Subsequently, when adopting the proposed distribution plan, Judge Pointer stated: "Class counsel—some of whom represent clients with existing medical problems and others of who represent clients without presently documented problems—have, with the Court, struggled . . . and reluctantly come to the conclusion that pro rata division remains the better—and indeed only workable—solution under the facts of this case."  District Court order, Docket No. 70 at 5.  This establishes not only that Hornsby was brought in and designated to represent exposure-only class members, but also that this procedural safeguard was put in place for the express purpose of addressing the divergent interests that could arise between present and future injury claimants.  For this reason, even if

60

Hornsby had previously represented some clients with current injuries, he, by agreeing to be the designated representative for the named plaintiff with merely future, potential claims, implicitly ceded the representation of any other clients to class counsel representing currently injured plaintiffs. We conclude that Juris has failed to show that her due process rights were violated.

Juris next urges us to find that she was not in fact adequately represented because Hornsby did not prosecute an appeal of Order 47A, the order certifying the settlement-only class and approving the settlement as fair, based on Ortiz v. Fibreboard Corp., 527 U.S. 815, 119 S. Ct. 2295 (1999). The Supreme Court's decision in Ortiz, which was still pending when Judge Pointer entered Order 47A, ultimately narrowed the grounds upon which certification of a limited fund class settlement could be supported. In support of her failure-to-appeal argument, Juris cites Gonzales v. Cassidy, 474 F.2d 67 (5th Cir. 1973).

In Gonzales, the plaintiffs collaterally attacked a class action judgment on the grounds that they had not been adequately represented. Id. at 72. In the prior proceeding, a three-judge district court declared a Texas statute unconstitutional. Id. at 71. However, that court limited the scope of relief by holding that its order only applied retroactively to the named plaintiff himself; with respect to all other class members, the court's order granted only prospective relief. Id. "Having

61

obtained relief for himself, [the class representative] did not appeal the court's

denial of retroactive relief to the other members of his class." Id.  The district

court rejected the argument that this constituted inadequate representation.  Id. 72.

On appeal, the former Fifth Circuit found that the named plaintiff's

representation was adequate up through the time that the three-judge court entered

its final order.  Id. at 75.  The Court then characterized the "narrow question"

before it as "whether [the class representative's] failure to appeal this order, which

denied retroactive relief to all members of the class except [himself], constitutes

inadequate representation so that they are not bound by the judgment."  Id.

Concluding that the failure to appeal rendered the representation inadequate, the

court explained:

> The problem is that he was representing 150,000 persons, who, although having had their licenses and registration receipts suspended without due process, were denied any relief by the three-judge court's prospective only application of its decision.  So long as an appeal from this decision could not be characterized as patently meritless or frivolous, [the named plaintiff] should have prosecuted an appeal. . . . [His] failure to prosecute an appeal deprived the members of his class, whose rights were not vindicated by the three-judge court's decision, of full participation in [the judicial] process.

Id. at 76.

Gonzales is easily distinguished from the case at bar.  That case does not

hold that a class representative's failure to appeal, in the abstract, will render

62

representation inadequate.  Critically, the absent plaintiffs in Gonzales had been "denied any relief" by the unappealed judgment's prospective application, and the fact that the representative had secured a better deal for himself than the remainder of the class prompted him not to pursue an appeal.  See Brown v. Ticor Title Ins. Co., 982 F.2d 386, 390 (9th Cir. 1992) ("In Gonzales, the class members collaterally attacked the settlement, demonstrating that the class representative secured a better monetary deal for himself than the rest of the class, and it was because of this that he failed to pursue an appeal on behalf of the class.  In the MDL 633 litigation, the settlement was similar for each class member.") (citation omitted); Kemp v. Birmingham News Co., 608 F.2d 1049, 1054 (5th Cir. 1979) ("Because Kemp received the same relief as all other members of the class, Gonzales is inapplicable."); see also Frank v. United Airlines, Inc., 216 F.3d 845, 852 (9th Cir. 2000) ("Consequently, when the class representatives chose not to appeal the adverse ruling on the facial validity of the weight policy, they abandoned any representation of the interests of those present and potential future class members in order to protect present class members seeking back pay and reinstatement.").  Here, it cannot be said that the rights of absent class members such as Juris "were not vindicated" by Order 47A.  Nor is there anything to suggest that Hornsby's failure to take an appeal was motivated by the fact that

63

Order 47A benefitted certain representatives to the detriment of other class members.  In electing not to appeal, Hornsby did not abandon the interests of the segment of the class he represented—i.e., the exposure-only claimants.[31]

Additional factors establish that Hornsby's decision not to appeal did not constitute inadequate representation.  First, even if filed the same day the Supreme Court decided Ortiz, any appeal of the limited fund class certification would have been untimely.  Judge Pointer entered Order 47A on February 1, 1999, and the Ortiz decision was released on June 23, 1999, approximately five months later.  More significantly, there was a compelling tactical reason for Hornsby *not* to pursue an appeal of Order 47A.  Inamed's senior creditors had conditioned financing of the settlement on certification of a mandatory class, and the undisputed evidence established that if class representatives or objectors successfully appealed, those lenders would have withdrawn financing and forced Inamed into a Chapter 7 liquidation.  Hornsby later explained, "I didn't file a notice of appeal obviously because I just didn't see where—it would have made

---

[31]    Juris does not contend that her due process rights were violated by Hornsby's failure to appeal Order 47B, which approved the allocation plan for the Inamed settlement fund. Nevertheless, we emphasize that the representatives received the same pro rata share of the settlement recovery that absent class members like Juris received.  The distribution plan also did not distinguish between presently injured claimants and those with only future, potential injuries. The decision not to appeal therefore did not advance the interests of some class members by subordinating the interests of others.  Indeed, an appeal of Order 47B may have actually been contrary to the interests of exposure-only plaintiffs.

64

the only arrangement that could have gotten claimants anything collapse because it would have delayed it, the investors would have pulled out and gone on, and I just didn't see the benefit." Opting not to take an appeal was not antagonistic to Juris's interests. Instead, it was a strategic decision that protected exposure-only claimants by ensuring that a limited fund even existed for the class's benefit.

Under these circumstances, Hornsby's decision not to prosecute an appeal of Order 47A based on the then-pending Ortiz does not call into question the extent to which he "vigorously and tenaciously protected the interests of the class." Gonzales, 474 F.2d at 75. That decision, therefore, did not render Hornsby's representation constitutionally inadequate.

In conclusion, Juris has not presented facts demonstrating a due process violation stemming from the lack of adequate representation.[32] Her inadequate

---

[32] Juris's remaining arguments do not warrant extended discussion. Her assertion that Hornsby made no objections at the certification/fairness hearing does not, without more, establish inadequate representation. Juris does not specify any particular objection that Hornsby should have presented. And significantly, each of the points now raised by Juris in this collateral posture were raised by objecting class members before Judge Pointer.

We likewise reject Juris's argument that representation was inadequate because nobody filed a Rule 60 motion to set aside the limited fund certification based on Inamed's 1998 10-K, which she contends undermined Inamed's pleas of poverty. Judge Pointer overruled an objection on similar grounds, and Judge Proctor made a reasonable finding of fact that Inamed's post-settlement economic rebound was due to the prospect that the company would be relieved from its overwhelming debt burden and its otherwise undisputed path towards insolvency. On appeal, Juris does not even attempt to challenge Judge Proctor's factual finding. We agree with Judge Proctor that "a failure to pursue an otherwise insubstantial question of fact or law does not amount to inadequate representation." District Court order, Docket No. 303 at 90.

65

representation claims cannot free her from the Inamed class settlement's preclusive effect.

### 3. Opt-out Rights and Personal Jurisdiction

Juris further argues that applying the Inamed settlement to bar her claims would violate due process because she did not have an opportunity to opt out or exclude herself. Juris asserts that because she was a California resident with no contacts with Alabama, the class action court—Judge Pointer's court—never had personal jurisdiction over her. Therefore, she urges us to conclude that, pursuant to Phillips Petroleum Co. v. Shutts, 472 U.S. 797, 105 S. Ct. 2965 (1985), she had a constitutional right to opt out.

In Shutts, the Supreme Court described the procedural requirements for asserting personal jurisdiction over absent, nonresident class members in a Kansas class action that asserted claims for money damages.[33] The petitioner argued that "Kansas should not be able to exert jurisdiction over the plaintiff's claims unless the plaintiffs have sufficient minimum contacts with Kansas." Id. at 808, 105 S. Ct. at 2972. The petitioner contended that the Kansas "opt out" procedure was not

---

[33]    The class action at issue there was certified under the Kansas equivalent of Federal Rule of Civil Procedure 23(b)(3). That is, the state procedural rule required that class members receive notice of the action by first-class mail and an opportunity to opt out and remove themselves from the litigation. Shutts, 472 U.S. at 810-11, 105 S. Ct. at 2974.

66

enough; instead, it posited, an "opt in" procedure—which would require plaintiffs without minimum contacts with the forum state to affirmatively consent to inclusion in the class—was necessary to satisfy due process.  Id. at 811, 105 S. Ct. at 2974.  The Court disagreed.  Id.  Noting that fewer burdens are placed on absent class-action plaintiffs than on absent defendants in non-class suits, the Court concluded that "the Due Process Clause need not and does not afford the former as much protection from state-court jurisdiction as it does the latter."  Id.

The Court held that "a forum State may exercise jurisdiction over the claim of an absent class-action plaintiff, even though that plaintiff may not possess the minimum contacts with the forum which would support personal jurisdiction over a defendant."  Id.  It proceeded to explain that a forum state could bind absent plaintiffs "concerning a claim for money damages or similar relief at law," so long as certain procedural protections are provided.  Id. at 811-12, 105 S. Ct. at 2974.  Namely, under the circumstances of that case, absent plaintiffs needed to receive notice and an opportunity to be heard, an opportunity to remove themselves from the class by returning an opt out, and adequate representation.  Id. at 812, 105. S. Ct. at 2974.  Because these minimal due process protections were afforded, Shutts concludes that the Kansas court properly asserted jurisdiction over the absent class members.  Id. at 814, 105 S. Ct. at 2976.  However, the Court emphasized:  "Our

67

holding today is limited to those class actions which seek to bind known plaintiffs concerning claims wholly or predominately for money judgments." Id. at 811 n.3, 105 S. Ct. at 2974 n.3. The Shutts court "intimate[d] no view concerning other types of class actions, such as those seeking equitable relief." Id.

Significantly, the question now before us—whether Shutts requires that an absent class member be afforded an opportunity to exclude herself from a limited fund class settlement—presents a question of first impression in this Circuit.[34] Shutts is a case about personal jurisdiction—i.e., the forum state's adjudicatory power over nonresident, non-consenting absent class members who did not otherwise have minimum contacts. Opt-out rights were of critical importance in Shutts for the reason that they allowed for an inference of consent, which was sufficient to support the class action court's jurisdiction over the class members who otherwise had no connection with Kansas.[35] With respect to these

---

[34]    In In re Temple, 851 F.2d 1269 (11th Cir. 1988), on appeal of a decision certifying a Rule 23(b)(1)(B) class, we stated that, based on a "literal reading of Shutts," absent class members "may . . . have the right to opt out of even a mandatory class action where the predominant issue is money damages." Id. 1272-73 n.5. However, because we vacated the certification order on other grounds, we did not need to decide the issue. Id.

[35]    Our understanding as to the import of Shutts finds support in the works of commentators interpreting that case. See, e.g., 4 William B. Rubenstein et al., Newberg on Class Actions § 13:33 (4th ed. 2011) ("[Under Shutts,] absent class members without minimum contacts with the forum had to consent to personal jurisdiction. This could be achieved with notice and opt-out provisions."); Arthur R. Miller et al., Jurisdiction and Choice of Law in Multistate Class Actions After Phillips Petroleum Co. v. Shutts, 96 Yale L. J. 1, 52 (1986) ("The right to opt out is essential to the Supreme Court's inference of consent, and that reasoning, in

68

nonresident, non-consenting absent plaintiffs, the opt-out rights functioned as a substitute for the traditional personal jurisdiction analysis (minimum contacts) applicable to defendants.  Therefore, courts have concluded, "the Shutts holding as to what due process requires where a court lacks personal jurisdiction over some class members does not apply where the court has an independent basis for jurisdiction."  In re Joint E. & So. Dist. Asbestos Litig., 78 F.3d 764, 778 (2d Cir. 1996); see, e.g., White v. Nat'l Football League, 41 F.3d 402, 407-08 (8th Cir. 1994) (finding that Shutts opt-out protection was inapplicable in a Rule 23(b)(1) class action where "each of the objectors either had minimum contacts with the forum or submitted himself to the jurisdiction of the district court"); Grimes v. Vitalink Commc'n Corp., 17 F.3d 1553, 1558 (3d Cir. 1994) ("Although the class members in the present case were not provided with an opportunity to opt out, the state court had the requisite power to bind absent class members as long as they had minimum contacts with the forum and they were not otherwise denied due

turn, is essential to the Court's validation of jurisdiction over members who have no affiliation with a distant forum."); Note, Stephen T. Cottreau, The Due Process Right to Opt Out of Class Actions, 73 N.Y.U. L. Rev. 480, 490 (1998) ("Where a state wishes to bind nonresidents lacking minimum contacts with the forum, due process requires the granting of opt out rights to establish consent of the class members to the court's adjudicatory jurisdiction.").  We also note that in Adams v. Robertson, 520 U.S. 83, 117 S. Ct. 1028 (1997), in dismissing a writ of certiorari as improvidently granted, the Court characterized the petitioner's contention in Shutts as arguing that "the state court lacked personal jurisdiction over out-of-state class members, not the different and broader question of whether . . . due process requires that all class members have the right to opt out."  Id. at 88-89, 117 S. Ct. at 1030.

process."); In re Drexel Burnham Lambert Grp., Inc., 960 F.2d 285, 292 (2d Cir. 1992) (holding that Shutts did not require opt-out rights in a Rule 23(b)(1)(B) class action because the plaintiffs had already submitted to the district court's jurisdiction by filing bankruptcy claims against the defendant); see also Arthur R. Miller et al., Jurisdiction and Choice of Law in Multistate Class Actions After Phillips Petroleum Co. v. Shutts, 96 Yale L. J. 1, 52 (1986) (explaining that whether a mandatory class can be brought after Shutts may depend on "whether there are sufficient contacts between the claimants (or the object of the action) and the forum").

In a limited fund class action, the presence within the jurisdiction of a res or fund that is the subject of the litigation resolves the personal jurisdiction objection of absent claimants. See Flanagan v. Ahearn (In re Asbestos), 90 F.3d 963, 987 (5th Cir. 1996) ("The court can appropriately adjudicate all claims against the fund because of its jurisdiction over the fund . . . .");[36] Fanning v. Acromed Corp. (In re

---

[36]    The Supreme Court granted certiorari and ultimately reversed the Fifth Circuit's Ahearn decision in Ortiz v. Fibreboard Corp., 527 U.S. 815, 119 S. Ct. 2295 (1999). However, the Court, which had the case on direct review of certification, resolved the appeal on the narrow grounds that the certification of the limited fund class was improper under the substantive requirements of Rule 23. Id. at 821, 119 S. Ct. at 2302. Thus, the decision was grounded in a construction of Rule 23(b)(1)(B) instead of due process. See id. at 830, 119 S. Ct. at 2307 ("The nub of this case is the certification of the class under Rule 23(b)(1)(B) on a limited fund rationale . . . ."). The Court did not reach the issue of whether and under what circumstances limited fund class members have a constitutional right to opt out. Therefore, the Fifth Circuit's concept that limited fund class members do not have a right to opt out under Shutts "was not disturbed by the

70

Orthopedic Bone Screw Prods. Liab. Litig.), 176 F.R.D. 158, 180 (E.D. Pa. 1997) (same); 6 William B. Rubenstein, et al., Newberg on Class Actions § 20:14 (4th ed. 2011) ("Certain types of equitable actions involving allocations of limited funds . . . historically have been deemed constitutional yet have never provided for opt-out rights."); Note, Stephen T. Cottreau, The Due Process Right to Opt Out of Class Actions, 73 N.Y.U. L. Rev. 480, 505 (1998) ("Many actions that demand a unitary adjudication will not require opt out rights because the forum will have minimum contacts with the class *or the property at stake*.") (emphasis added); Miller et al. supra, at 52 ("For example, a case concerning a limited fund located in a particular state can be brought as a mandatory action, because the nexus between the fund, the claimants, and the action supports the exercise of jurisdiction over claimants even against their will."); Barbara A. Winters, Jurisdiction over Unnamed Plaintiffs in Multistate Class Actions, 73 Cal. L. Rev. 181, 197 (1985) ("There could still be jurisdiction over such non residents if, for example, rights to a res within the state were at issue in the litigation."). The class action court's adjudicatory power over the claimants in such a case is akin to *in rem* or *quasi in rem* jurisdiction. See Ahearn, 90 F.3d at 987 ("This view of a

---

Supreme Court [because] the case was reversed on other grounds." 4 William B. Rubenstein et al., Newberg on Class Actions § 13:34 (4th ed. 2011).

71

limited-fund class action as similar to an action *in rem* makes particular sense because . . . the court in such an action has before it for disposition all the assets in which class members could claim an interest."); In re Joint E. & S. Dist. Asbestos Litig., 982 F.2d 721, 734-35 (2d Cir. 1992) (holding that *in rem* and *quasi in rem* jurisdiction was available over absent class members because trial courts were "fully entitled to exercise jurisdiction over the beneficiaries of a [limited fund] trust created in New York, pursuant to the authority of the Southern District bankruptcy court"), modified on reh'g, 993 F.2d 7 (2d Cir. 1993); Grimes, 17 F.3d at 1567-68 (Hutchinson, J., dissenting) ("Many cases which state or seem to imply that personal jurisdiction can be exercised over absent members of a plaintiff 'class' without minimum contacts are 'common fund' cases in which the court entertaining the action had jurisdiction over nonresident members. Jurisdiction there is present because the plaintiffs have a property interest in the fund or alternatively because the court had *in rem* or *quasi in rem* jurisdiction over the fund.").[37] We hold that the $31.5 million limited fund recovery, which was

---

[37]    "Like an interpleader action, the raison d'etre of a limited fund or impairment class action is the prejudice and impairment of rights that would result to some claimants if others are permitted to seek individual adjudications." 6 William B. Rubenstein et al., Newberg on Class Actions § 20:14 (4th ed. 2011). That is, a unitary adjudication of a limited fund is necessary for the very reason that permitting a class member to opt out of such a limited fund "would defeat its essential purpose." Id.; see also Ortiz, 527 U.S. at 838, 119 S. Ct. at 2311 ("The concept driving [limited fund actions] was insufficiency, which alone justified the limit on early feast to avoid a later famine."); Ahearn, 90 F.3d at 986 ("Unitary adjudication of a limited

72

deposited into a court-supervised settlement account in Birmingham, Alabama,

prior to class certification, provided Judge Pointer's court with jurisdiction over

the fund and all claimants to that fund, wherever located.[38]

---

fund is crucial because allowing plaintiffs to sue individually would make the litigation an unseemly race to the courtroom door with monetary prizes for a few winners and worthless judgments for the rest.") (quotations and citation omitted); Zechariah Chafee, Jr., Bills of Peace with Multiple Parties, 45 Harv. L. Rev. 1297, 1311 (1932) (explaining that in a limited fund case "it is impossible to make a fair distribution of the fund or limited liability to all members of the multitude except in a single proceeding where the claim of each can be adjudicated with due deference to the claims of the rest"). Because a court cannot separately resolve individual claims to a limited fund without prejudicing the rights of absent claimants, equity demands that all claimants to a limited fund be represented before the court and bound by the court's disposition of the fund. See Ortiz, 527 at 835-36, 119 S. Ct. at 2309-10.

[38]    The cases cited in Juris's brief are easily distinguished and not persuasive with respect to our analysis. For example, she relies heavily on In re Real Estate Title & Settlement Services Antitrust Litigation, 869 F.2d 760 (3d Cir. 1989), and Brown v. Ticor Title Insurance Co., 982 F.2d 386 (9th Cir. 1992). Both cases analyzed the due process rights of absent members in the same class action, which was certified under Rule 23(b)(1)(A) and (b)(2), not (b)(1)(B). Real Estate, 869 F.2d at 763; Brown, 982 F.2d at 392. Significantly, the courts' due process discussion—more specifically, their treatment of the opt-out issue—was not in the context of a limited fund. In fact, the Real Estate court expressly stated that its holding did not "address the due process requirements in a class action certified under Rule 23(b)(1) in which there is only a limited common fund from which the plaintiffs can obtain relief." 869 F.2d at 768 n.8.

Juris's reliance on In re Telectronics Pacing Systems, Inc., 221 F.3d 870 (6th Cir. 2000), is also unavailing. In that case, the Sixth Circuit reversed a Rule 23(b)(1)(B) certification because the limited fund settlement at issue suffered from some of the same deficiencies as that in Ortiz. Most notably, there was no limited fund because the district court excluded the value of two potentially liable parent companies in calculating the "fund available" for satisfying the claims. Id. at 878. Although the named defendant alone did not have assets sufficient to cover the expected tort liability, the settlement released the parent companies who would have been "able to bear the expense of litigation and pay damages if found liable." Id. In the case at bar, there were no insurance assets and there were no parent companies. Inamed's assets constituted the entirety of the fund available to satisfy the claims, and the fund at issue was limited independently of any agreement by the parties. Finally, Juris's citations to Jefferson v. Ingersoll International Inc., 195 F.3d 894 (7th Cir. 1999), and Molski v. Gleich, 318 F.3d 937 (9th Cir. 2003), are likewise unpersuasive. Those cases arose in the context of direct appeals of class certification, and each involved a Rule 23(b)(2) class action, not a limited fund action certified pursuant to 23(b)(1)(B). Jefferson, 195 F.3d at 897; Molski, 318 F.3d at 943.

The opt-out requirement in Shutts addressed the class action court's jurisdiction over absent class members without minimum contacts with the forum. Because established law[39] holds that a court with jurisdiction over a res or fund also has jurisdiction over all claims against that fund, Juris's personal jurisdiction objection is resolved, and the need for opt-out rights is removed.[40]

---

[39] The court's jurisdiction in a limited fund action is well-established as is indicated in the foregoing authorities, and is akin to that described in common fund cases. In the common fund cases, it was established historically that, so long as the interests of all claimants are represented before the court, a unitary decision with respect to common interests in the fund will bind all claimants to that fund. See, e.g., Mullane v. Ctr. Hanover Bank & Trust Co., 339 U.S. 306, 313, 70 S. Ct. 652, 656 (1950) ("It is sufficient to observe that . . . the interest of each state in providing means to close trusts that exist by the grace of its laws and are administered under the supervision of its courts is so insistent and rooted in custom as to establish beyond doubt the right of its courts to determine the interests of all claimants, resident or nonresident, provided its procedure accord full opportunity to appear and be heard."); Hartford Life Ins. Co. v. Ibs, 237 U.S. 662, 670-71, 35 S. Ct. 692, 695 (1915) ("The fund was single . . . . It would have been destructive of their mutual rights in the plan of mutual insurance to use the mortuary fund in one way for claims of members residing in one state, and to use it another way as to claims of members residing in a different state."); Smith v. Swormstedt, 57 U.S. 288, 303 (1853) ("For convenience, therefore, and to prevent a failure of justice, a court of equity permits a portion of the parties in interest to represent the entire body, and the decree binds all of them the same as if all were before the court. The legal and equitable rights and liabilities of all being before the court by representation, and especially where the subject matter of the suit is common to all, there can be very little danger but that the interest of all will be properly protected and maintained.").

[40] In resolving Juris's particular opt-out challenge, we note two additional issues which today's opinion does not address. First, Allergan argues that the Shutts holding with respect to opt-out rights is simply inapplicable in a limited fund case. In essence, Allergan urges us to adopt the broader reasoning of the Fifth Circuit in Ahearn, 90 F.3d at 986, which holds that "[t]he limitation of Shutts to claims that are predominantly for money damages forecloses application of its holding to 23(b)(1)(B) actions which have always been equitable and often involve unknown plaintiffs." Juris responds that Shutts applies with equal force to the Inamed class settlement because, although it was certified under Rule 23(b)(1)(B), it purportedly bound class members with respect to their individual claims for money damages. See id. at 1004-06 (Smith, J., dissenting) (arguing that not all classes certified under Rule 23(b)(1)(B) seek equitable

74

D. Propriety of Class Certification

Juris dedicates other portions of her briefs to arguing that Judge Pointer erred in certifying the Inamed settlement class. She claims that the class did not conform to the Ortiz v. Fibreboard Corp., 527 U.S. 815, 119 S. Ct. 2295 (1999), requirements for certification under Rule 23(b)(1)(B), and also that the settlement was not an appropriate substitute for bankruptcy. We hold that these arguments

---

relief and that a limited fund settlement that resolves mass torts would not be equitable). As discussed, the inference of consent to jurisdiction from the opt-out procedure as understood in Shutts is not needed in the instance case, where Judge Pointer's court had jurisdiction over all Inamed claimants by virtue of the limited fund's presence in the forum state. We therefore need not decide more broadly whether Shutts is simply not applicable at all in a limited fund class action because such an action is equitable in nature. In similar circumstances, the Third Circuit did not address this broader issue. See Grimes, 17 F.3d at 1560 n.7.

        Second, commentators have suggested that all class members may have a due process right to opt out that is grounded in the right to individual control of litigation. Under this view of the opt-out right, absent members may have a due process right to exclude themselves from the class even in situations, such as the instant case, where the court's adjudicatory jurisdiction over them is not subject to question. See Miller et al., supra, at 54 ("Another way to analyze Shutts is a decision protecting the right to opt out for its own sake. In this view, the right to opt out not only is a check against distant forum abuse, but it also protects the claimant's right to control her litigation."); Cottreau, supra, at 510 (arguing that "due process requires opt out rights in some class actions where no jurisdictional concerns exist"). Juris briefly mentioned this alternative opt-out argument before Judge Proctor, although even there her suggestion was sufficiently vague and unaccompanied by any reasoning or authority that it is doubtful the argument was preserved. In any event, her position on appeal can only be understood as arguing that Judge Pointer's "court lacked personal jurisdiction over out-of-state class members, not the different and broader question of whether, [even] if a state has jurisdiction over the plaintiffs, due process requires that all class members have the right to opt out of the class and settlement agreement." Adams, 520 U.S. at 88-89, 117 S. Ct. at 1030. Because the alternative opt-out argument has not been fairly raised on appeal, we deem it abandoned and decline to entertain it. See Marek v. Singletary, 62 F.3d 1295, 1298 n.2 (11th Cir. 1995).

are—at this stage—barred by res judicata.

In Ortiz, the Supreme Court reversed class certification in a Rule 23(b)(1)(B) limited fund class action that purported to settle actual and potential asbestos-related tort claims. After describing traditional limited funds, the Court identified three "common characteristics" consistent with the "historical limited fund model." Id. at 838, 119 S. Ct. at 2311. "The first and most distinctive characteristic," Ortiz explains, "is that the totals of the aggregated liquidated claims and the fund available for satisfying them, set definitively at their maximums, demonstrate the inadequacy of the fund to pay all the claims." Id. The second historical characteristic is that "the whole of the inadequate fund was to be devoted to the overwhelming claims." Id. at 839, 119 S. Ct. at 2311. The third characteristic is that "the claimants identified by a common theory of recovery were treated equitably among themselves." Id. According to the Court, these characteristics should be treated as "presumptively necessary, and not merely sufficient," to justify certification of a Rule 23(b)(1)(B) limited fund class. Id. at 842, 119 S. Ct. at 2312. Because the settlement at issue in Ortiz failed to satisfy these presumptively necessary characteristics, the Court concluded that certification was improper. Id. at 864, 119 S. Ct. at 2323. Ortiz ultimately leaves open the question of whether—even if the three essential premises are

76

supported—a mandatory, limited fund class settlement can ever be used to resolve tort claims.  Id. at 844, 119 S. Ct. at 2314.

Judge Proctor concluded that Juris's argument that the Inamed settlement class was erroneously certified under Rule 23(b)(1)(B) amounted to an improper basis for seeking relief under Rule 60.  He expressly held that Juris's attack on the certification order was "foreclosed as a matter of law," because "a collateral attack, such as one launched through Rule 60(b) proceedings, is not a vehicle for subsequently correcting past errors of law, which undoubtedly includes a conclusion as to certification under Rule 23(b)."  District Court order, Docket No. 303 at 45.  Stated otherwise, Juris's Rule 23 contentions were not cognizable due process arguments available to an absent plaintiff collaterally attacking a prior class judgment.  Judge Proctor then proceeded to explain:  "*But even if Juris were able to contest Judge Pointer's conclusions of law*, the court finds *in the alternative* that the Inamed class settlement was properly certified as a limited fund."  Id. (emphasis added).  Thus, in what was a true alternative holding, the district court found that the Ortiz requirements for application of the limited fund rationale under Rule 23(b)(1)(B) had been satisfied.

On appeal, Juris argues that Judge Proctor's alternative conclusion—that the Inamed settlement possesses the presumptively necessary characteristics of a

limited fund—is off the mark.  She asserts that, if anything, Judge Pointer should

have certified the class under Rule 23(b)(3), as opposed to 23(b)(1)(B).

Significantly, however, Juris has not challenged, or even acknowledged, Judge

Proctor's holding that this line of argument is foreclosed as a matter of law by the

doctrine of res judicata.  Allergan claims that Juris has therefore waived any

argument on this issue, and we agree.  In the absence of any argument to the

contrary, we will not disturb the district court's holding that Juris's position with

respect to the propriety of Judge Pointer's final, unappealed class certification

presented an improper basis for collateral attack.[41]

Thus, our primary holding in this Part II.D is that, by failing to challenge

Judge Proctor's res judicata holding on appeal, Juris has abandoned any challenge

to the propriety of the Rule 23(b)(1)(B) certification by Judge Pointer.  See

Sepulveda v. U.S. Attorney Gen., 401 F.3d 1226, 1228 n.2 (11th Cir. 2005)

("When an appellant fails to offer argument on an issue, that issue is abandoned.").

However, even in the absence of Juris's waiver, we would affirm Judge Proctor's

---

[41]    Allergan's response brief clearly argues, under a separate heading styled in bold type face, that Juris failed to challenge the district court's holding that her class certification argument was not a proper collateral attack.  Nevertheless, Juris's reply brief fails to address the res judicata issue.  Instead, Juris continues to dispute only Judge Proctor's alternative conclusion, contending that "the Inamed class settlement did not qualify for certification under Rule 23(b)(1)(B) as required by Ortiz," and that "certification of the Inamed settlement class was defective under the standards pronounced by Ortiz."

78

res judicata conclusion.  There is considerable support for the proposition that a collateral attack is not a vehicle for an absent class member to retrospectively challenge the propriety of class certification under the Federal Rules of Civil Procedure.  Put otherwise, an absent class member cannot escape the res judicata effect of a prior judgment by demonstrating—without more—that certification was in error or that the class should have been certified under a different subsection of Rule 23.

"[C]ertain fundamental defects—lack of subject matter jurisdiction, personal jurisdiction, or due process—in a prior litigation will render the judgment void and without legal effect . . . ."  Note, Collateral Attack on the Binding Effect of Class Action Judgment, 87 Harv. L. Rev. 589, 593-94 (1974).  However, "the res judicata consequences of a final, unappealed judgment on the merits [are not] altered by the fact that the judgment may have been wrong or rested on a legal principle subsequently overruled in another case."  Federated Dep't Stores, Inc. v. Moitie, 452 U.S. 394, 398, 101 S. Ct. 2424, 2428 (1981).  Therefore, an absent class member will not typically be able to collaterally attack a prior judgment by arguing that there was an error in the certification.[42]

---

[42]    The Supreme Court's decision dismissing a writ of certiorari as improvidently granted in Ticor Title Insurance Co. v. Brown, 511 U.S. 117, 114 S. Ct. 1359 (1994), is illustrative.  Therein, the Court stated: "Before the Ninth Circuit, respondents did not (and indeed

It should be emphasized that Ortiz arose on direct appeal of certification, not a collateral attack; and as discussed above—and as Juris concedes—the Court expressly decided the case on a construction of Rule 23(b)(1)(B), rather than due process. Juris asserts that Judge Pointer erred in certifying the Inamed settlement class because it did not satisfy the rules-based requirements for limited fund treatment later announced in Ortiz. She has not attempted to articulate how that alleged Rule 23 error amounts to a jurisdictional defect or a violation of due process, making it an appropriate subject for attempting to avoid res judicata in a collateral attack.[43] Moreover, although Juris asserts that certification of the class was in error because the settlement was an inappropriate substitute for bankruptcy,

could not) [collaterally] challenge whether the class in the MDL No. 633 litigation was properly certified under Rules 23(b)(1)(A) and (b)(2)." Id. at 120, 114 S. Ct. at 1361. According to the Court, res judicata prevented that non-constitutional issue from being relitigated on collateral attack; "[i]t was conclusively determined in the MDL No. 633 litigation that respondents' class fit within Rule 23(b)(1)(A) and (b)(2)," and "even though that determination may have been wrong, it is conclusive upon these parties." Id. at 121, 114 S. Ct. at 1361-62.

[43]    Admittedly, Ortiz states that "serious constitutional concerns" provide "further counsel against adventurous application of Rule 23(b)(1)(B)." 527 U.S. at 845, 119 S. Ct. at 2314. However, the constitutional concerns expressed in Ortiz related to *risks* entailed in adventurous departures from the traditional characteristics of the limited fund cases. By contrast, in this collateral attack on a final judgment, Juris must demonstrate an actual violation of her due process rights. To be sure, we do not rule out the possibility that—in addition to adequacy of notice, adequacy of representation, and the right to opt out—the extent to which there was a "truly limited fund" could ever be the subject of a collateral attack. However, even assuming that some other case might involve departures from a "truly limited fund" sufficiently significant as to rise to the level of a due process violation, Juris has wholly failed to identify any such deficiency in this case.

80

she provides no explanation as to how that potential error would rise to the level

of a constitutional or jurisdictional deficiency.[44]  Accordingly, even in the absence

of Juris's waiver of any challenge to Judge Proctor's res judicata holding, we

would affirm the district court's holding that Juris is barred from bringing her

rules-based challenges to Judge Pointer's certification.[45]

_____

[44]    Juris cites to In re Joint Eastern & Southern District Asbestos Litigation, 982 F.2d 721 (2d Cir. 1992), modified on reh'g, 993 F.2d 7 (2d Cir. 1993).  That case discusses the possibility that the use of a limited fund class action in situations where there is a likelihood that an aggregate of tort claims would render a defendant insolvent may "constitute[] an impermissible circumvention of bankruptcy law protections." Id. at 738.  Significantly, the court's analysis was in the context of a direct appeal from certification, and not collateral review, and the discussion therein is grounded in terms of comparing the procedural protections available under the statutory bankruptcy scheme with those provided by the class action procedures of Rule 23.  See id. at 736 ("To lessen the risk that these pressures will lead to unfair compromises, bankruptcy law provides numerous safeguards not contained in class action procedures.").  The court framed the issue as whether a Rule 23(b)(1)(B) class should have been certified given the court's rules-based and policy-based concerns.  There is nothing in the court's decision (or Juris's appellate briefs) to suggest that circumventing the bankruptcy scheme would entail the sacrifice of absent class members' constitutional rights.
    In any event, although the Joint Eastern court vacated certification on other grounds, it actually concluded that "the need to insist on bankruptcy law protections" was not so great as to prevent certification of a limited fund settlement class under the circumstances.  Id. at 739-40.  We also note that, in Ortiz, the Supreme Court expressly stated that "there is no inherent conflict between a limited fund class action under Rule 23(b)(1)(B) and the Bankruptcy Code."  527 U.S. at 860 n.34, 119 S. Ct. at 2321 n.34.

[45]    Although the propriety vel non of Judge Pointer's Rule 23(b)(1)(B) certification is an issue which is not before us—both because of Juris's failure to challenge Judge Proctor's res judicata holding and because of the merits of the operation of res judicata—we make brief comments to illustrate how far short of any due process violation are the relevant facts.  Judge Pointer's Rule 23(b)(1)(B) certification was far different from that in Ortiz.  To the extent the instant circumstances depart at all from the historical limited fund model, it is not nearly as significant a departure as Juris suggests.
    Ortiz first requires that there be a demonstration that the fund, "set definitively at [its] maximum," is inadequate "to pay all the claims."  527 U.S. at 838, 119 S. Ct. at 2311.  Unlike the facts of Ortiz, Judge Pointer undertook a careful analysis of both the magnitude of the claims

and the value and adequacy of the entirety of the resources to pay those claims. Because there was no insurance coverage, the only resources available to pay claims were Inamed's own assets. In contrast with Ortiz, external factors here—not the mere agreement of the parties—imposed the limit on the size of the fund. The fund was limited by the net value of the entirety of the assets of Inamed. As summarized in Part I.A and Part I.C, supra, Judge Pointer's careful findings of fact established that the $31.5 million settlement fund was substantially greater than the value of the entirety of the net assets of Inamed which could have been available to pay claims in the absence of certification, and that the magnitude of the claims of the class members far exceeded that value. Moreover, notwithstanding the absence of a serious challenge to these crucial facts, Judge Proctor carefully reviewed the evidence and Judge Pointer's findings. Judge Proctor similarly found that the $31.5 million fund was the maximum amount that could have been available for the claimants, and that the claims of the class far exceeded any possible recovery. On appeal, Juris fails to challenge these crucial fact findings by Judge Pointer and Judge Proctor, and she has never denied that the value of the outstanding tort claims vastly exceeded the assets available to meet the claims.

The second defect identified in Ortiz was the fact that the limited fund settlement failed to ensure "equity among the members of the class." 527 U.S. at 854, 119 S. Ct. at 2318. There are two issues here, "the inclusiveness of the class and the fairness of distributions to those within it." Id. In Ortiz, the settlement was improper in part because class counsel had agreed to "exclude what could turn out to be as much as a third of the claimants that . . . might eventually be involved." Id. at 854, 119 S. Ct. at 2319. There has been no suggestion that any such exclusions occurred with respect to the instant settlement class. The Ortiz limited fund class was also improper because the lack of structural protections—i.e., "independent representation as for subclasses with conflicting interests"—ran contrary to the equitable obligation within the limited fund rationale. Id. at 855-57, 119 S. Ct. at 2319-20. Here, as discussed in Part II.C.2, supra, the proceedings before Judge Pointer were protected by the functional equivalent of subclasses, and these "procedures . . . resolve[d] the difficult issues of treating . . . differently situated claimants with fairness as among themselves." Ortiz, 527 U.S. at 856, 119 S. Ct. at 2319. Juris can hardly make any challenge to the equity among the class members, particularly in light of the fact that she was a mere future claimant at the time, and future claimants shared with the currently injured on a pro rata basis.

The final feature of the settlement in Ortiz that departed from the historical model was "the ultimate provision for a fund smaller than the assets understood . . . to be available." Id. at 859, 119 S. Ct. at 2321. The Court stopped short of deciding whether this fact would alone be fatal, but it observed that the defendant contributed only $500,000 of its own assets, retaining nearly all of its net worth, with an estimated value of around $235 million. Id. at 859-61, 119 S. Ct. at 2321-22. The bulk of the settlement recovery was provided for by the company's insurers. Id. Importantly, Ortiz leaves open how close to insolvency a limited fund defendant would need to be brought as a condition of certification, id. at 860 n.34, 119 S. Ct. at 2321 n.34, and also the extent to which saved transaction costs and expenses "that would never have gone into a class member's pocket in the absence of settlement" may be credited to the defendant as an incentive to settle, id. at 860-61, 119 S. Ct. 2321-22. Here, it is significant that Judge Proctor found that,

82

E. Anti-Injunction Act

Finally, Juris argues that the Anti-Injunction Act barred the district court

from enjoining her California state court action.  The Anti-Injunction Act prohibits

a federal court from enjoining state court proceedings "except as expressly

---

beyond the $31.5 million loaned by Inamed's senior noteholders, the company had almost no other assets to contribute to the settlement, and the entirety of the settlement fund was earmarked exclusively for the class.  Additionally, Judge Pointer found and Judge Proctor confirmed that Inamed had a negative net worth, net liquidation value of essentially zero, and no resources to pay claims.  As noted above in note 14, supra, and in stark contrast with Ortiz, it is undisputed that the recovery fund ultimately provided for the class was greater than the assets understood to be available.

Thus, although the issue is not before us, the instant certification would seem to fall within the dicta of Ortiz:  "[I]f Fibreboard's own assets would not have been enough to pay the insurance shortfall plus any claims in excess of the policy limits, the projected insolvency of the insurers and Fibreboard would have indicated a truly limited fund."  527 U.S. at 853, 119 S. Ct. at 2318.  We note also that the record here reflects that the settlement was reached by arms-length dealings.  Moreover, the instant case may be unique in that there can be no concern about conflicts of interest on the part of class counsel by virtue of the potential gigantic fees emphasized by the Ortiz court.  Id. at 852 n.30, 119 S.Ct. at 2317 n.30.  Judge Proctor found that, "unlike Ortiz, class counsel in this case received their fees from a separate account, funded years earlier, by a coalition of breast implant manufacturers."  District Court order, Docket No. 303 at 54.  There is also no issue here regarding a defendant-favorable forum selection; the forum was carefully selected by the Judicial Panel on Multidistrict Litigation.

However, even assuming arguendo that a court on direct review would, after Ortiz, be reluctant to approve certification of a limited fund class on these facts, that could provide no comfort to Juris.  In the collateral challenge posture of this case, Juris must demonstrate more than the failure to satisfy the requirements of Rule 23(b)(1)(B).  She must demonstrate that her own due process rights were violated.  In the preceding sections of this opinion, we have addressed each argument asserted by Juris to support a due process violation, and concluded that each argument is without merit.  In addition, the particular facts of this case suggest the very opposite of a due process violation; they indicate fundamental fairness.  It is apparent that there was adequate notice, that class objectors had ample opportunity to make—and did make—all the arguments Juris now raises, that future claimants like Juris received adequate representation, and finally, it is apparent that the class did in fact receive a greater recovery than was possible with any other available option.

authorized by Act of Congress, or where necessary in aid of its jurisdiction, or to protect or effectuate its judgments."  28 U.S.C. § 2283.  We hold that the district court's injunction in this case was permissible because it was necessary "in aid of its jurisdiction" and "to protect or effectuate its judgments."[46]

### 1. In Aid of Jurisdiction

The "necessary in aid of" jurisdiction exception to the ban on federal injunctions exists "to prevent a state court from so interfering with a federal court's consideration or disposition of a case as to seriously impair the federal court's flexibility and authority to decide that case."  Atl. Coast Line R.R. v. Bhd. of Locomotive Eng'rs, 398 U.S. 281, 295, 90 S. Ct. 1739, 1747 (1970).  As a general matter, however, "[c]oncurrent *in personam* jurisdiction does not satisfy

---

[46]    It is not clear that the Anti-Injunction Act is even applicable under the present circumstances.  The district court entered Order 47A in 1999, permanently enjoining the Inamed settlement class members from "instituting, asserting or prosecuting . . . in any pending or future action in any federal or state court, any Settled Claim that the member had, has, or may have in the future," and Juris subsequently commenced the California suit in 2006.  District Court order, Docket No. 59 at 5; see Dombrowski v. Pfister, 380 U.S. 479, 484 n.2, 85 S. Ct. 1116, 1119 n.2 (1965) ("This statute and its predecessors do not preclude injunctions against the institution of state court proceedings, but only bar stays of suits already instituted."); Martingale LLC v. City of Louisville, 361 F.3d 297, 303 (6th Cir. 2004)  (agreeing that "the Anti-Injunction Act does not prevent a court from enjoining the parties from *commencing* state court proceedings, as opposed to enjoining the parties from *proceeding with* already-filed state actions.").  As noted above in the penultimate sentence of Part I.F, supra, Judge Proctor in 2010 did not himself issue an injunction against the California suit.  Rather, he held that Judge Pointer's 1999 injunction was binding on Juris, thus barring her subsequent 2006 California suit.  However, because we reject Juris's Anti-Injunction Act argument on other grounds, we need not decide whether the Act is even applicable in this situation.

84

the 'necessary in aid of jurisdiction' exception to the Anti-Injunction Act."  17A

Moore's Federal Practice § 121.07 (3d ed. 2010).  As such, this Court has

explained that:

> Ordinarily, a federal court may issue an injunction 'in aid of its
> jurisdiction' in only two circumstances: (1) the district court has
> exclusive jurisdiction over the action because it had been removed
> from state court; or, (2) the state court entertains an *in rem* action
> involving a res over which the district court has been exercising
> jurisdiction in an *in rem* action.

In re Ford Motor Co., 471 F.3d 1233, 1250-51 (11th Cir. 2006).

Importantly, federal courts have recognized a narrow exception to this

general rule, allowing the "in aid of its jurisdiction" exception to be used "to

enjoin parallel state class action proceedings that might jeopardize a complex

federal settlement and state *in personam* proceedings that threaten to make

complex multidistrict litigation unmanageable."  17A Moore's Federal Practice §

121.07 (3d ed. 2010).  For example, in Battle v. Liberty National Life Insurance

Co., 877 F.2d 877 (11th Cir. 1989), we held that a district court that had issued a

final judgment in a complex and lengthy class action, and expressly retained

jurisdiction over the settlement, properly enjoined a subsequent state court suit

involving substantially similar claims.  We stated that "it ma[de] sense to consider

th[e] case, involving years of litigation and mountains of paperwork, as similar to

85

a res to be administered," and that the "lengthy, complicated litigation [wa]s the 'virtual equivalent of a res.'" Id. at 882 (quotations and citation omitted). We reasoned that "[a]ny state court judgment would destroy the settlement worked out over seven years, nullify this court's work in refining its Final Judgment over the last ten years, add substantial confusion in the minds of a large segment of the state's population, and subject the parties to added expense and conflicting orders." Id. (quotations and citation omitted); see also Wesch v. Folsom, 6 F.3d 1465, 1470-71 (11th Cir. 1993) (affirming injunction and finding that "virtual equivalent of a res to be administered" existed where the district court had "invested a great deal of time and other resources in the arduous task of reapportioning Alabama's congressional districts").

The lengthy, complicated litigation at issue in this case was likewise the "virtual equivalent of a res." The district court has spent countless hours managing the highly complex multidistrict breast implant litigation, and it was only after years of extended settlement negotiations that the parties were able to resolve the claims of over 40,000 Inamed breast implant recipients. Moreover, the district court, like that in Battle, retained exclusive jurisdiction to review, interpret, and enforce the Inamed class settlement. The district court has continually exercised that jurisdiction in interpreting the Inamed settlement

86

agreement and supervising the escrow agent charged with administering the settlement fund. Admittedly, "Battle and Wesch offer little guidance as to how the parallel federal and state proceedings were sufficiently similar to an *in rem* proceeding so as to warrant an injunction." Burr & Forman v. Blair, 470 F.3d 1019, 1032-33 (11th Cir. 2006). However, we agree with Judge Proctor that this "paradigmatically complex" litigation "presumptively satisfies this standard."[47] District Court order, Docket No. 303 at 109.

### 2. To Protect or Effectuate Judgments

The "to protect or effectuate" judgments exception to the Anti-Injunction Act, referred to as the "relitigation exception," is "appropriate where the state law claims would be precluded by the doctrine of *res judicata*." Burr & Forman, 479 F.3d at 1029-30 (citation omitted). "In a sense, the relitigation exception empowers a federal court to be the final arbiter of the res judicata effects of its own judgments because it allows a litigant to seek an injunction from the federal court rather than arguing the res judicata defense in the state court." Id. at 1030 n.30; see also Wesch, 6 F.3d at 1471 ("[The relitigation exception] is essentially a

---

[47]    Notably, Judge Proctor found that "the Battle fiction (that a complex class action is sufficiently comparable to a *res*) is arguably unnecessary here." District Court order, Docket No. 303 at 108 n.53. As discussed above, the district court continues to supervise the equitable division of a limited fund, which is "not analogous to a *res*—it is a *res*." Id. Thus, the instant case is very different from the situation addressed by Judge Tjoflat's opinion in Burr & Forman.

87

res judicata concept designed to prevent issues that have already been tried in federal court from being relitigated in state court.").

Without elaboration or citation to authority, Juris makes a conclusory assertion that the relitigation exception cannot apply because the Inamed class action did not result in a decision on the merits.[48]  The record belies that assertion. For purposes of determining res judicata, an order approving a settlement agreement provides a final determination on the merits.  See Martin v. Pahiakos, 490 F.3d 1272, 1277 (11th Cir. 2007); Norfolk S. Corp. v. Chevron, U.S.A., Inc., 371 F.3d 1285, 1288 (11th Cir. 2004); Citibank, N.A. v. Data Lease Fin. Corp., 904 F.2d 1498, 1501-02 (11th Cir. 1990).  Judge Pointer's Order 47A was styled "Order and Final Judgment"; further, after stating that "every Settled Claim of each member of the Inamed Settlement Class is conclusively compromised, settled and released," Order 47A dismissed those claims with prejudice.  District Court order, Docket No. 59 at 1, 4-5.  Accordingly, the Inamed class settlement resulted

---

[48]    Juris also argues that this exception is inapplicable because the class judgment in Order 47A did not satisfy the demands of due process.  Juris is correct that an injunction contained in a class judgment may be collaterally attacked on due process grounds.  See Stephenson v. Dow Chem. Co., 273 F.3d 249, 257 (2d Cir. 2001) ("The injunction was part and parcel of the judgment that plaintiffs contend failed to afford them adequate representation.  If plaintiffs' inadequate representation allegations prevail, as we so conclude, the judgment, which includes the injunction on which defendants rely, is not binding as to these plaintiffs."), aff'd in part by an equally divided court and vacated in part, 539 U.S. 111, 123 S. Ct. 2161 (2003).  However, because we have already resolved Juris's due process and personal jurisdiction challenges, we need not address them again here.

88

in a decision on the merits, and we hold the district court's injunction was necessary "to protect or effectuate its judgments."

## III. CONCLUSION

We emphasize the collateral posture of this case. Judge Pointer's order certifying the Inamed settlement class as a limited fund class under Rule 23(b)(1)(B) is not before us on direct appeal. The issue is not whether we would on direct appeal vacate certification under the strict Rule 23 guidelines later announced in Ortiz or whether Rule 23(b)(1)(B) should be used to settle aggregated tort claims in a post-Ortiz world. Instead, Juris can avoid the res judicata effect of the Inamed class settlement only by demonstrating a violation of her due process rights. This she has not done.

Upon review, we conclude that the 1999 Inamed class settlement precludes Juris from bringing her action against Allergan. Accordingly, we affirm.

AFFIRMED.